

# SUPREME COURT OF MISSOURI
## en banc

STATE ex rel. REGINALD CLEMONS,     )
    )
               Petitioner,     )
    )
v.     )     No.  SC90197
    )
STEVE LARKINS, SUPERINTENDENT,     )
    )
               Respondent.     )

### ORIGINAL PROCEEDING IN HABEAS CORPUS

*Opinion issued November 24, 2015*

Reginald Clemons was convicted of two counts of first-degree murder and sentenced to death for the April 5, 1991 murders of sisters, Julie Kerry and Robin Kerry. Mr. Clemons filed a petition for a writ of habeas corpus in this Court, seeking to vacate his convictions because he claims that newly discovered evidence shows that he was prejudiced when the state violated *Brady v. Maryland,* 373 U.S. 83 (1963), by withholding material evidence.  In the alternative, Mr. Clemons requests that this Court vacate his death sentences because his sentences are disproportional due to his age and lack of criminal record, new evidence that Mr. Clemons' confession was coerced, evidence that Mr. Clemons' did not directly murder the Kerry sisters but acted only as an accomplice, and because of the reduced sentence of a "more culpable" codefendant.

This Court appointed a special master under Rule 68.03 to take evidence and issue findings of fact and conclusions of law as to Mr. Clemons' allegations.  After hearing

multiple days of testimony and reviewing thousands of pages of record, the master issued a report in which he found that the state had violated *Brady* by failing to produce evidence favorable to Mr. Clemons that a witness observed an injury to Mr. Clemons' face shortly after a police interrogation and that the witness documented his observations of the injury in a written report that was later altered by the state. The master determined that the state's failure to disclose this evidence was prejudicial to Mr. Clemons because it could have led to the suppression of Mr. Clemons' confession, a critical part of the state's case against Mr. Clemons. Substantial evidence supports the master's findings that the state deliberately violated *Brady* and that, in the absence of the undisclosed material evidence, the jury's verdicts are not worthy of confidence. Accordingly, this Court vacates Mr. Clemons' convictions and sentences for first-degree murder.[1] Within 60 days from the date the mandate issues in this case, the state may file an election in the circuit court to retry him. If the state does not so elect, the case against Mr. Clemons shall be dismissed, and Mr. Clemons shall be discharged on this matter.

---

[1] On June 19, 2007, Mr. Clemons received a 15-year sentence for committing violence to a department of corrections employee to be served consecutively to his death sentence. *Clemons v. Steele*, No. 4:11CV379 JCH, 2011 WL 5912617, at *1 (E.D. Mo. Nov. 28, 2011). As such, Mr. Clemons shall remain in the state's custody.

**Facts and Procedural Background[2]**

Around 11:35 on the evening of April 4, 1991, 20-year-old Julie Kerry and her 19-year-old sister, Robin,[3] took their visiting cousin, Thomas Cummins, to the Chain of Rocks Bridge in St. Louis.[4]  The sisters wished to show Mr. Cummins a poem they had written on the bridge several years before.  The cousins arrived at the bridge around midnight.

As the cousins began to walk east on the bridge, they saw a group of four men coming from the Illinois side.  Mr. Cummins later identified the men as Reginald Clemons, Marlin Gray, Antonio Richardson, and Daniel Winfrey.  The two groups had a brief conversation on the bridge.  Mr. Winfrey asked the Kerry sisters for a cigarette.  Mr. Gray demonstrated to the others how to climb over the bridge railing and come back up through a manhole in the deck of the bridge.  He commented to Mr. Cummins that the manhole was a "good place to be alone and take your woman."  The groups then parted ways.

The cousins continued walking toward the Illinois side when they heard footsteps approaching them from behind.  It was the four men.  Mr. Winfrey later testified that the four men decided to return to the cousins after Mr. Clemons suggested they rob them and

---

[2] Portions of this opinion are taken without attribution from the Court's opinion in *State v. Clemons*, 946 S.W.2d 206 (Mo. banc 1997), and the amended final report of the special master.

[3] Because the two sisters share the same surname, they will be referred to by their first names for clarity.  No disrespect is intended.

[4] The Chain of Rocks Bridge is a former highway bridge that spans the width of the Mississippi River, connecting Missouri to Illinois.  At the time of the crimes, it was abandoned.

3

Mr. Richardson suggested they rape the girls. At first, the four men were, again, friendly to the cousins. As all seven began walking together toward the Missouri side, Mr. Gray grabbed Mr. Cummins by the arm, walked him back a short distance, and ordered him to the ground. Mr. Cummins immediately complied and remained facedown after Mr. Gray warned Mr. Cummins that he would kill him if he looked up.

Mr. Cummins then heard his cousins begin to scream. Mr. Cummins believed he continued to be guarded by Mr. Gray, while the other men raped the Kerry sisters. Eventually, Mr. Gray left and Mr. Cummins was guarded by other members of the group. He heard one of the men say that he had never had the pleasure of "poppin' somebody." He did not know who said this but he did not believe it was Mr. Gray.

Mr. Cummins heard sounds of a struggle and Julie continuing to scream. One of the men told one of the Kerry sisters to take off her pants and threatened to throw her off the bridge if she did not comply. One of the men returned to Mr. Cummins and asked Mr. Cummins if he had any money. The man then took $20 and a Swatch watch from Mr. Cummins.[5] When the man removed Mr. Cummins' wallet from his pocket, he discovered a badge and "freaked." Another man demanded to know if Mr. Cummins was a police officer and was told that Mr. Cummins was a firefighter, not a "cop." Several of the men approached Mr. Cummins. One told Mr. Cummins that he had Mr. Cummins' driver's license and would come and get him if Mr. Cummins told anyone what had

---

[5] Three days later, on April 8, 1991, the watch stolen from Mr. Cummins was found hidden in a residence where Mr. Gray had recently visited. On this discovery, Mr. Cummins returned from Maryland to Missouri to view a series of lineups. From the lineups, Mr. Cummins was able to identify Mr. Clemons, Mr. Gray, Mr. Richardson, and Mr. Winfrey as his assailants.

4

happened. Mr. Cummins was then told to get up and to keep looking down as he was moved along the bridge toward the Missouri side. He was then forced to lie down again. Two of the men talked to Mr. Cummins about whether he would live or die and argued over whether to kill Mr. Cummins.

Mr. Clemons then approached Mr. Cummins and told him he had raped his girlfriend and asked how that felt. Mr. Cummins told him that she was not his girlfriend, she was his cousin. Mr. Clemons then told Mr. Cummins to get up and keep his head down. Mr. Clemons walked Mr. Cummins over to an open manhole in the bridge and had him sit on the edge of the manhole. Mr. Cummins was then told to go through the manhole onto a steel platform suspended about five feet below the surface of the bridge. When he did this, Mr. Cummins saw the Kerry sisters lying on their backs on the platform.

Other than the Kerry sisters, Mr. Cummins did not see anyone else on the metal platform at that time. After laying down on the platform, he heard two thuds that he believed were two sets of feet dropping onto the platform. He felt the cousin who was lying next to him move back and forth, which he believed was caused by someone raping her. Mr. Cummins and the cousins were then told to step down onto a concrete pier about three feet below the platform. Although he could only see one of the men, he believed two of them were still on the platform. Without warning, he saw an arm push

Julie and then Robin off the bridge.[6]  He was told to jump by the man that he later identified as Mr. Richardson, and he did.

When he surfaced in the Mississippi River, Mr. Cummins briefly had contact with Julie but then lost sight of her.  He never saw Robin.  Authorities recovered Julie's body from the river near Caruthersville three weeks later.  Robin's body was never found.  Eventually, Mr. Cummins was able to reach the bank on the Missouri side of the river south of the Chain of Rocks Bridge.  He climbed up the bank and found a road.  Shortly before 2:00 a.m., Eugene Shipley was driving a truck south of the Chain of Rocks Bridge near the St. Louis Waterworks when he saw Mr. Cummins step onto the road to flag him down.  Mr. Shipley observed that Mr. Cummins' hair was wet and unkempt and he was crying.  Mr. Cummins told Mr. Shipley that he needed help, that his cousins had been raped, and that he had been thrown off the bridge.

Officers from the St. Louis Metropolitan Police Department responded to the scene after being contacted by Mr. Shipley.  When the police officers arrived at the Chain of Rocks Bridge, they questioned Mr. Cummins.  After it got light, the police took Mr. Cummins onto the bridge and he showed them where the events took place.  The police found a number of items on the bridge including a set of keys carried by Mr. Cummins, an unused condom, a used condom, a pen, some change, and a cigarette butt.  A black flashlight engraved with "Horn I" was also discovered several hundred yards east of the other items.

---

[6] Mr. Cummins stated that he saw a "black" arm push Julie off the bridge and that the same or another black arm pushed Robin off the bridge.  Mr. Clemons, Mr. Richardson and Mr. Gray were black and Mr. Winfrey was white.

6

Even though Mr. Cummins was questioned at the scene, his first recorded statement was taken at the police station around 9 a.m. by Detectives Raymond Ghrist and Gary Stittum. While Mr. Cummins was being interviewed by Detectives Ghrist and Stittum, another officer attempted to enlist assistance in searching the river for the Kerry sisters. When he contacted the Missouri State Water Patrol, he spoke with an officer and was told information about the river currents and the water temperature that caused him to doubt Mr. Cummins' statements. Other erroneous information, including the belief that Mr. Cummins was lying because he could have simply fought off the four assailants given that none of them ever pulled a weapon, caused the police to obtain another recorded statement from Mr. Cummins.

Mr. Cummins' second recorded statement was conducted by Detectives Richard Trevor and John Walsh. This statement lasted until 12:40 p.m. and was largely consistent with what Mr. Cummins had first told Mr. Shipley and the responding officers at 2:00 a.m. just after the police were contacted. Nevertheless, a May 31, 1991 incident report that purportedly summarized Mr. Cummins' statements in the second recorded interrogation, materially mischaracterized his statements to indicate he said that he and Julie had become close when they were both visiting Florida the year before and that they were close to having sex. It also incorrectly stated that Mr. Cummins changed his story and said that he had not jumped off the bridge and, instead, ran from the bridge and got wet only when he jumped into the water from the bank to search for the Kerry sisters.

The police then obtained Mr. Cummins' consent to submit to a polygraph examination. Although Mr. Cummins' condition and the circumstances under which the

7

polygraph was performed were such that its results should not have been given any credence, the police proceeded. When the test was completed, the examiner told Mr. Cummins that the test showed he was "deceptive." The police then talked with Mr. Cummins' father and told him information that temporarily convinced him that his son could not have survived a jump from the bridge and that his son's polygraph test was classified as deceptive. Mr. Cummins' father talked to Mr. Cummins and urged him to tell the truth. The police then claimed that Mr. Cummins changed his story to say he ran off the bridge, jumped in the water only up to his neck, and then ran for help. Later under oath, Mr. Cummins vehemently disputed having ever made these statements.

According to police reports prepared after Mr. Cummins had been cleared by the police for the deaths of the Kerry sisters, Lieutenant Steven Jacobsmeyer, deputy commander of the Crimes Against Peoples Unit, and Detective Chris Pappas and Detective Joseph Trevor interrogated Mr. Cummins again after they became aware of Mr. Cummins' allegedly changed of story. The report stated that, although Mr. Cummins refused to make a recorded statement, he told these officers that he tried to have sex with Julie but she was unwilling, they argued, he pushed her, and she lost her balance and fell off the railing of the bridge. When this happened, he became hysterical and blacked out, and he believed that either Robin jumped into the river to save her sister or he pushed her in. Following this alleged confession, the police arrested Mr. Cummins and announced to the media that the Chain of Rocks murders were solved.

Mr. Cummins later testified that after his father left the interrogation room, he was threatened by Lieutenant Jacobsmeyer that if he did not tell the police officers what they

8

wanted to hear, "he was going to put [Mr. Cummins] in the hospital that night and he had witnesses that would say [Mr. Cummins] resisted arrest." Mr. Cummins stated that the police yelled and screamed at him and that he was told to sit on his hands, at which time one of the detectives twisted his neck while another gave him at least ten "hard blows" in the back of the head. Mr. Cummins stated that, despite this abuse, he did not make the statements reported by Lieutenant Jacobsmeyer and Detectives Pappas and Trevor.

About the same time as Mr. Cummins was being interrogated and charged with the murders, the police received a call from a woman who had seen a television news story about the search for the owner of a black flashlight engraved with "Horn I." She identified the flashlight as one that had been stolen a few days earlier. The information she gave eventually led to the arrest of Mr. Richardson. The police apprehended Mr. Richardson on April 6 and, during an interrogation, Mr. Richardson implicated both Mr. Gray and Mr. Clemons.[7]

On the evening of April 7, 1991, St. Louis police officers located Mr. Clemons and asked if he would accompany them to police headquarters because his name had surfaced in "the bridge case." Mr. Clemons agreed. At this time, Mr. Clemons was not under arrest. According to police, Mr. Clemons was advised of his rights, indicated that he understood his rights, and agreed to speak with the police. He was then interrogated for approximately 45 minutes, took a 20 break, and then was interrogated for another hour and 15 minutes by Detective Pappas and Detective Joseph Brauer.

---

[7] Mr. Richardson was not able to identify the other male in the group, but police later ascertained that the man was Mr. Winfrey.

During the first interrogation, Mr. Clemons admitted only to having been with Mr. Richardson, Mr. Gray, and a person he did not know – later identified as Mr. Winfrey – at the Chain of Rocks Bridge on the night of the murders but denied having any involvement in the rapes and murders. During the second interrogation, when Mr. Clemons was asked whether he knew Julie and Robin Kerry, he responded by asking if they "were the two girls on the bridge with the white dude." According to police, Mr. Clemons then voluntarily agreed to give a recorded statement.

During the recorded statement, Mr. Clemons said that on the evening of April 4, he went with Mr. Richardson, Mr. Gray, and the unidentified white male to the Chain of Rocks Bridge. After they arrived, Mr. Richardson gave Mr. Clemons a large flashlight, and the group began to walk across the bridge. During their walk, they approached two white females and one white male and spoke with them briefly. Thereafter, Mr. Richardson came up with the idea of robbing the male and raping the two females. They all agreed to participate. Mr. Clemons admitted he robbed Mr. Cummins, raped one of the girls and was on the metal platform below the bridge with the three victims and Mr. Richardson. Mr. Clemons also admitted that Mr. Richardson told him that he was going to push the sisters into the water because he did not want to leave any witnesses and that Mr. Clemons made no comment to Mr. Richardson's suggestion. Additionally, he stated that the Kerry sisters were stripped by Mr. Richardson and Mr. Gray, that Mr. Richardson hit one of the sisters in the face when she tried to fight him off, that the Kerry sisters were conscious and screaming during the repeated rapes and when they were pushed off the bridge, that one sister was forced to perform oral sex on

10

Mr. Richardson, and that, after Mr. Richardson pushed one sister off, the other sister grabbed the wrist of Mr. Richardson, who then punched her and pushed her off the bridge. In Mr. Clemons' recorded statement, he denied, however, that he pushed anyone off the pier and stated that it was Mr. Richardson who pushed the victims into the water. At the conclusion of his statement around 1:00 to 2:00 a.m. on April 8, Mr. Clemons was arrested and booked for murder. Booking photographs were taken at this time.[8]

While Detectives Brauer and Pappas were interrogating Mr. Clemons, Detectives Trevor and Walsh located Mr. Gray at a friend's house and brought him into custody. Mr. Gray was then interrogated by Detectives Trevor, Brauer, and Pappas.[9] During a recorded statement by Mr. Gray, he admitted to raping both sisters but denied being in the manhole when the sisters and Mr. Cummins were pushed off the pier. When his statement was complete, Mr. Gray was arrested and booked for murder. On April 8 at 2:10 p.m., approximately 14 hours after Mr. Clemons' interrogation had ended, Officer Warren Williams, who was the ex-husband of a cousin of Mr. Clemons' mother and a police officer for the city of St. Louis, visited Mr. Clemons in a holdover cell on the request of Mr. Clemons' mother. During the visit, Mr. Clemons told Officer Williams that he got in with the wrong people, had gotten drunk before going to the Chain of Rocks Bridge, had raped two girls on the bridge and had left his flashlight on the bridge

---

[8] The master did not make a finding as to whether these booking photographs indicated trauma to Mr. Clemons' face.

[9] By the time of Mr. Gray's interrogation, Detective Pappas had finished his interrogation of Mr. Clemons and began interrogating Mr. Gray with Detective Trevor. At some point during Mr. Gray's interrogation, Detective Brauer replaced Detective Trevor and completed the interrogation with Detective Pappas.

11

but that another boy had pushed the girls into the water. Officer Williams did not observe any injuries to Mr. Clemons during his visit.

Mr. Clemons' attorney, Michael Kelly, met with him shortly after Officer Williams had visited. Mr. Kelly observed swelling and a small abrasion to Mr. Clemons' right check, a small abrasion on the inside of his lip, and bruises on his chest. When Mr. Clemons made his first court appearance the next day, his family also observed that there was an injury to his face. At the court hearing, Mr. Clemons' sister, Veronda Brown, observed that the right side of his face looked lopsided and swollen. Donald Robinson, Mr. Clemons' cousin, saw that the right side of his face was swollen and his right eye was swollen closed. Mr. Clemons' mother, Vera Thomas, observed that the right side of his face was swollen and stuck out. His stepfather, Reynolds Thomas, also saw that the right side of his face was swollen and puffy. The judge who presided over that court hearing ordered that Mr. Clemons be medically examined. He was taken to the emergency room at Regional Medical Center, where Dr. Stephen Duntley diagnosed Mr. Clemons with soft tissue swelling over the right sarcoma or cheek bone and tenderness at that site.

Within a short time after Mr. Clemons and Mr. Gray were arrested and booked, they both filed complaints with the police department's Internal Affairs Division (IAD), alleging that they had been beaten by the detectives who interrogated them. On April 9, 1991, at 3:13 p.m., two IAD investigators interviewed Mr. Clemons at the jail regarding his allegations. In the transcript of that interview, Mr. Clemons told the investigators that, on April 7, he was taken into an interview room and that the detectives started

asking him questions. Mr. Clemons stated that he told the detectives that he had nothing to do with the murders on the bridge and, after being advised of his constitutional rights, stated that he wanted to talk to an attorney. Following the request, Mr. Clemons stated that a detective slapped him in the back of the head twice, again advised him of his constitutional rights, and threatened to bounce him off the wall if he did not talk. Mr. Clemons again said he wanted a lawyer. Mr. Clemons said that at some point he was told to scoot back from the table and to sit on his hands and one of the detectives slammed the back of his head into the wall. When he still refused to talk, Mr. Clemons' head was again slammed against the wall, he was choked, and he was hit in the chest by one of the detectives. He told IAD investigators that both detectives continued to strike him repeatedly until he eventually lost consciousness.

After regaining consciousness, Mr. Clemons agreed to make a statement to avoid more physical abuse. The officers wrote out what they wanted Mr. Clemons to say and had him read it over and over so he could remember it. The notes instructed Mr. Clemons to declare that he was the one who pushed the women off the bridge. He refused to make that admission, and the officers told Mr. Clemons to say that he raped one of the sisters and restrained Mr. Cummins. After he made the recorded statement, Mr. Clemons claimed that the police were unhappy with it, beat him some more, and ordered him to make a new tape. In the second tape, Mr. Clemons again confessed to the rapes and robbery, but not to the murders.

Mr. Gray's complaint filed with the IAD alleged that his statement was coerced because he had been beaten by the police. Mr. Gray was interviewed by the IAD

13

investigator on April 9, 1991, a little before 5:00 p.m. Mr. Gray stated that he was not advised of his rights and was told he could not have an attorney. When Mr. Gray refused to talk, he was struck by one of the police officers. He was then uncuffed and told to sit on his hands. He was then beaten in three different interrogation sessions. The detectives wrote out the statement they wanted Mr. Gray to make, and he eventually gave a tape-recorded statement confessing to robbing Mr. Cummins and raping the Kerry sisters. He also denied pushing the Kerry sisters off the bridge.

Prior to trial, Mr. Clemons moved to suppress his statement to the police on the ground that it was involuntary because police had obtained it by beating him, in violation of his constitutional rights. The court conducted a hearing on the motion. Detectives Pappas and Brauer testified that they were present for three interrogations of Mr. Clemons and that neither of them hit Mr. Clemons or observed any injuries. Officer Williams, who visited Mr. Clemons in his holdover cell on April 8, also testified for the state. He, too, stated that he did not observe any injuries to Mr. Clemons when he saw him approximately 14 hours after Mr. Clemons had been interrogated.

Mr. Clemons also called several witnesses, including the members of his family and his attorney who had observed his injuries on April 8 and April 9. Additionally, Mr. Clemons testified at the suppression hearing on his own behalf, stating that Detective Pappas and another detective hit him in the head and chest while they were interrogating him. To corroborate his testimony, Mr. Clemons made an offer of proof of the transcript of Mr. Cummins' testimony from Mr. Gray's trial, in which Mr. Cummins said that he was beaten by the police and then was alleged to have made statements that led to his

14

arrest for the murders of the Kerry sisters.[10]  The state objected that Mr. Cummins'

statements were not relevant to whether Mr. Clemons had been beaten.  After finding that

the transcript of Mr. Cummins' testimony from Mr. Gray's trial did not show any alleged

similarity in tactics employed by the police in interrogating Mr. Cummins and

Mr. Clemons, the trial court sustained the state's objection to the offer of proof.[11]

After hearing the evidence, the trial court overruled Mr. Clemons' motion to

suppress his confession.  The court held that "the basis for [its] ruling is there was not any

credible evidence to show how [Mr. Clemons] got those injuries if, in fact, he got them.

And that was other than [his] testimony."

Mr. Clemons' trial commenced on January 25, 1993, and lasted until February 18,

1993.  The state's evidence against Mr. Clemons included Mr. Clemons' confession, the

testimony of Mr. Cummins, and the testimony of Mr. Winfrey.[12]  Mr. Cummins testified

consistently with his prior statements to the police.  Mr. Winfrey testified that

Mr. Clemons participated in the crimes by grabbing Mr. Winfrey and pushing him toward

the side of the bridge until Mr. Winfrey agreed that he would participate in the rapes;

ripping the clothes off one of the Kerry sisters and getting on top of her; getting on top of

---

[10] Mr. Gray's trial ended on October 23, 1992, before Mr. Clemons' suppression hearing began on February 1, 1993.

[11] While Mr. Clemons' and Mr. Gray's statements to the IAD officers mirrored Mr. Cummins' testimony that the police had used the unusual tactic of requiring the suspects to sit on their hands while beating them during the interrogations, Mr. Clemons did not testify about this tactic during the motion to suppress hearing so the trial court could not have recognized this similarity.

[12] Codefendant Mr. Winfrey, who was 15 years old at the time of the murders, pleaded guilty to two counts of second-degree murder, two counts of forcible rape, and one count of first-degree robbery, in exchange for a recommendation of a 30-year sentence from the state.  Mr. Winfrey was released from prison in 2007.

the other sister; taking one of the Kerry sisters to the manhole; robbing Mr. Cummins; throwing the girls' clothing over the side of the bridge; putting Mr. Cummins in the manhole; sitting on the edge of the manhole when he sent Mr. Winfrey to find Mr. Gray; and telling Mr. Gray and Mr. Winfrey, "We threw them off. Let's go."

At his trial, Mr. Clemons did not testify on his own behalf, but he did present witnesses who testified they observed Mr. Clemons' bruised face after he had been questioned by the police. In addition to his family and his attorney, Dr. Duntley, the emergency room doctor who examined him as ordered by the judge, testified for the defense that Mr. Clemons had soft tissue swelling and tenderness on his right cheek bones that could have been caused by Mr. Clemons' cheek being hit against a solid object, such as a wall or bar.

Before closing arguments, the state moved to prohibit argument by defense counsel that the police beat Mr. Clemons because the only evidence presented was that he had injuries but not how they were sustained. Because the trial court found the police denied causing the injuries and Mr. Clemons did not dispute the officers' testimony by presenting competent evidence as to who was responsible for inflicting the injuries, the trial court held that there was no evidentiary basis to support argument that the police coerced Mr. Clemons' confession. Accordingly, the trial court sustained the state's motion to prevent Mr. Clemons from arguing in his closing argument that his confession was coerced because he was beaten by police. Nevertheless, the trial court submitted a

16

jury instruction proffered by Mr. Clemons regarding the voluntariness of his confession.[13]

After deliberations, the jury found Mr. Clemons guilty of two counts of first-degree murder.

During the sentencing phase of Mr. Clemons' trial, the jury heard testimony from more than 30 thirty witnesses – 13 called by the state and 18 called by Mr. Clemons. Mr. Clemons again did not testify on his own behalf. During deliberations, the jury sent a message to the judge asking for "[a]ll photographs, tape recorded tapes (audio), statements of Winfrey, Cummins, Clemons[.]" The judge ordered that the jury receive all photographs admitted into evidence and the transcripts of Mr. Winfrey's and Mr. Cummins' statements. The jury was not allowed to hear audio recordings of Mr. Winfrey's and Mr. Cummins' statements because these were not played at trial. The jury was returned to the courtroom, where the court again played the recorded audio statement of Mr. Clemons to the jury. While listening to the audio recording, the jury

---

[13] Jury instruction number 27 stated:

> Evidence has been introduced that the defendant made certain statements relating to the offense for which he is on trial.
>
> If you find that a statement was made by the defendant, and that this statement was freely and voluntarily made under all of the circumstances surrounding and attending the making of the statement, then you may give it such weight as you believe it deserves in arriving at your verdict.
>
> However, if you do not find and believe that the defendant made the statement, or if you do not find and believe that the statement was freely and voluntarily made under all the circumstances surrounding and attending the making of the statement, then you must disregard it and give no weight in your deliberation.

17

was allowed to review a transcript of his statement. The jury was not able to take the audio recording or the transcript of Mr. Clemons' statement to the deliberation room.

The jury found 12 aggravating circumstances and recommended two death sentences. Following the jury's recommendation, the trial court sentenced Mr. Clemons to death for each of the murders.[14]

On November 1, 1993, Mr. Clemons filed a motion to vacate, set aside or correct the judgment or sentence of the trial court pursuant to Rule 29.15. The trial court overruled the motion after an evidentiary hearing. In a consolidated appeal, this Court affirmed Mr. Clemons' convictions and sentences and affirmed the trial court's overruling of Mr. Clemons' motion for post-conviction relief. *State v. Clemons*, 946 S.W.2d 206 (Mo. banc 1997).

In his direct appeal, Mr. Clemons raised numerous claims of error, including that the trial court erred by allowing into evidence his confession because it had been obtained through physical force by police. In this Court's opinion affirming his convictions, it

---

[14] In separate trials, codefendant Gray was convicted of two counts of first-degree murder and sentenced to death on each count, and codefendant Richardson was convicted of one count of first-degree murder and one count of second-degree murder. Mr. Richardson was sentenced to death for first-degree murder and to life imprisonment for second-degree murder. Their convictions and sentences were affirmed on direct appeal. *State v. Gray*, 887 S.W.2d 369 (Mo. banc 1994); *State v. Richardson,* 923 S.W.2d 301 (Mo. banc 1996). Mr. Gray's sentence was carried out in 2005. Mr. Richardson's capital sentence was summarily set aside by this Court in *State v. Richardson*, No. SC76059, order entered October 29, 2003, because of a constitutional violation arising from the trial judge's sentencing following a jury deadlock. *See State v. Whitfield*, 107 S.W.3d 253, 257-58 (Mo. banc 2003) (applying the rule of law articulated in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), that only the jury may determine the aggravating factors for sentencing in capital cases).

determined that Mr. Clemons had not met his burden of proving that his confession was involuntary. *Id.* at 218. In so ruling, this Court recited the evidence in the light most favorable to the trial court's ruling, particularly Officer Williams' testimony that he did not observe an injury to Mr. Clemons during his visit. *Id.* The Court noted that the trial court had the opportunity to judge the credibility of the witnesses and obviously found the state's witnesses more credible than Mr. Clemons' witnesses. *Id.* The Court found that the evidence, other than Mr. Clemons' testimony from his suppression hearing, did not demonstrate either when or how Mr. Clemons incurred any injury and that the evidence did not establish that an injury actually occurred at the hand of the police officers conducting his interrogation. *Id.* The Court further found that, while there was evidence of his physical injuries, his family's observations of his injuries occurred 48 hours or more after his interrogation and confession. *Id.*

After his convictions and sentences and the overruling of his post-conviction motion were affirmed, Mr. Clemons filed a writ of certiorari with the United States Supreme Court, which denied the writ without comment on November 10, 1997. He subsequently filed a petition for a writ of habeas corpus in the United States District Court that included a claim that his confession was a product of coercion in violation of his Fifth Amendment privilege against self-incrimination. The district court denied relief on this claim but granted the petition and vacated the death penalty on other grounds.[15]

---

[15] The district court found that the trial judge had improperly excused some potential jurors during jury selection and, on that ground, ordered that Mr. Clemons' death sentence be vacated and that he either be resentenced to life without parole or given a new trial.

*Clemons v. Luebbers*, 212 F.Supp 2d 1105 (E.D. Mo. 2002). The state appealed, and the United States Court of Appeals for the Eighth Circuit, reversed. *Clemons v. Luebbers*, 381 F.3d 744, 757 (8th Cir. 2004).

On June 12, 2009, Mr. Clemons filed a petition for a writ of habeas corpus in this Court pursuant to article V, section 4 of the Missouri Constitution, asserting that newly discovered evidence established his "actual innocence"[16] and that he has a right to have the proportionality of his death sentence reviewed, despite this Court's previous finding that his sentence was proportional.

As authorized by Rule 68.03, this Court appointed a special master to take evidence and issue a master's report on the claims in the habeas petition. The master presided over discovery in the matter.[17] He heard three days of live and videotaped testimony from 23 witnesses and conducted an in-depth review of the evidence and trial record.

Before the master had conducted a formal hearing on the matter, Warren Weeks, who now lives more than 1,000 miles away from St. Louis, contacted Mr. Clemons'

---

[16] Specifically, Mr. Clemons, in his actual innocence claim, alleges newly discovered evidence of the fact that $150,000 was paid to settle the lawsuit Mr. Cummins filed in 1993 against members of the police department, in which he alleged they assaulted him in an attempt to coerce a confession. He argues this newly discovered evidence supports his claim that his confession was physically coerced. Mr. Clemons, however, did not include this claim in the "Points Relied On" section of his brief to this Court. Accordingly, because Mr. Clemons did not include his "actual innocence" claim in his brief to this Court, it is considered waived and will not be addressed in this opinion. See Rule 84.04(d).

[17] The evidentiary hearing was delayed for several years due to difficulty in obtaining DNA results and the parties' requests for additional discovery. Both parties consented to these delays to fully develop the record in the case.

counsel after learning about the special master proceeding. In response to Mr. Weeks'

expected testimony and, apparently without objection, Mr. Clemons expanded his

grounds for habeas relief to assert what is commonly called a "cause and prejudice"

claim.[18]

At the time of Mr. Clemons' arrest in April 1991, Mr. Weeks was a bail

investigator working for the Missouri Board of Probation and Parole. In that capacity,

Mr. Weeks was responsible for screening individuals soon after their arrests to see if they

qualified for release. Specifically, Mr. Weeks interviewed arrestees for the purpose of

obtaining information for a court commissioner's consideration in deciding whether a

prisoner should be given a pretrial release immediately or be held over until the prisoner

could appear before a judge.

In a videotaped deposition presented in evidence by agreement after the three-day

hearing before the master, Mr. Weeks testified that he conducted his interviews in a small

room with three desks – one for Mr. Weeks, one for his supervisor, and one for a court

commissioner. A guard would bring one to four prisoners into the room. The prisoners

would be seated about three feet across from the investigator's desk and were each

interviewed for 5 to 10 minutes. Mr. Weeks was responsible for interviewing prisoners

and filling out a three-page pretrial release form that included information about the

---

[18] A petitioner seeking habeas relief under a cause and prejudice claim must show that his failure to comply with procedural rules was due to a "cause" external to the defense and this Court's failure to review this claim would "prejudice" him. *Woodworth v. Denney*, 396 S.W.3d 330, 337 (Mo. banc 2013).

prisoner's employment, residence, criminal background, and mental or physical problems.

Mr. Weeks testified he was on duty on the morning of April 8, 1991, and Mr. Clemons was brought to him for his pretrial release assessment around 5:25 a.m. His interview of Mr. Clemons took place approximately three hours after Mr. Clemons was booked and more than eight hours before Mr. Williams' visit with Mr. Clemons in the holdover cell. Mr. Weeks testified that, during this interview, he noticed a "bump" or a "bruise" on Mr. Clemons' right cheek that he described as being between the size of a golf ball and a baseball. He asked Mr. Clemons about the bump, but Mr. Clemons did not respond. Mr. Weeks made a record of Mr. Clemons' injury on the pretrial release form and believes that he wrote "bump" or "bruise" on the form.

Mr. Weeks testified that after he had completed the pretrial release form, he would have given it to the court commissioner, Yvonne Edwards, to review, and she would then record additional information on the form. Mr. Weeks testified he did not see the form again after giving it to the court commissioner for review. When Mr. Weeks viewed the pretrial release form during his deposition, he testified that his notation of a "bump" or a "bruise" had been scratched out and could not be read. He also stated that he recognized Ms. Edwards' handwritten "okays" written throughout the form, her notations of "asthmatic – medication," "follow up for police report, submit," and "no bond," and her signature on the first page of the form. Mr. Weeks testified he had not scratched out "bump" or "bruise" and did not know who had.

Mr. Weeks further testified that he discussed Mr. Clemons' injury with his supervisor, Pete Lukanoff, after Mr. Clemons and the other prisoners left the room. Mr. Lukanoff's desk was situated right next to Mr. Weeks' during the time Mr. Clemons was seated across the desk from Mr. Weeks. After the prisoners left the room, he commented to Mr. Lukanoff that Mr. Clemons' injury might be from a spider bite. But, after speaking with Mr. Lukanoff who was a former St. Louis city police officer, Mr. Weeks testified he believed the injury occurred while Mr. Clemons was being interrogated by the police.[19] Mr. Weeks testified that his interview of Mr. Clemons was otherwise unremarkable.

Mr. Weeks further testified that several months after interviewing Mr. Clemons and filling out the form, Ben Coleman, another supervisor in the probation and parole office, called him into his office and questioned him regarding his ability to observe any injuries to Mr. Clemons. Mr. Weeks testified that he had never before been called to talk to Mr. Coleman or Mr. Lukanoff about his notations on a pretrial release form and had never heard of any of his colleagues being called to talk to the supervisors about such a matter. Mr. Coleman explained to Mr. Weeks that Nels Moss, the state's prosecutor in

---

[19] During his deposition, Mr. Weeks testified that Mr. Lukanoff started laughing in response to his comment about Mr. Clemons' injury possibly being from a spider bite. He testified that Mr. Lukanoff told him "that's – that kind of bump gets there when a . . .." The state then objected on the grounds of hearsay. His attorney voluntarily rephrased his question to Mr. Weeks, and instead asked him what Mr. Lukanoff's reaction was. Mr. Weeks then testified without objection that Mr. Lukanoff was not surprised by the injury because "[h]e had seen them before" and that Mr. Lukanoff had been a police officer for five or 10 years. Mr. Lukanoff was not referenced in the IAD report so it is not known if he was interviewed during the IAD investigation. He did not testify at Mr. Clemons' trial and, at the time of the master's hearing, Mr. Lukanoff was deceased.

Mr. Clemons' case, wished to speak with Mr. Weeks about his evaluation of Mr. Clemons. Mr. Weeks testified that after his meeting with Mr. Coleman he felt pressured not to say anything about Mr. Clemons' injury.

Mr. Weeks then was called to meet with Prosecutor Moss. In that meeting, Mr. Moss also challenged the accuracy of Mr. Weeks' observations of the injury to Mr. Clemons' face and showed him pictures of Mr. Clemons taken shortly after Mr. Clemons' interrogation by the police that did not appear to show any injury to Mr. Clemons' face. Mr. Weeks testified that he had never before been called to talk to a prosecutor about an interview and had never heard of any of his colleagues being called to talk to the prosecutor.

Mr. Weeks testified he told Mr. Moss that the photos did not make him change his mind about Mr. Clemons' injury because "[he] saw what [he] saw and everybody saw what they saw who was in that interview room." Mr. Weeks testified that Mr. Moss "made it very clear that he didn't think that [Mr. Weeks] was describing [the injury] accurately based on the pictures." Nevertheless, Mr. Weeks maintained that he had observed the injury to Mr. Clemons as he recorded it on the pretrial release form. Mr. Weeks testified that Mr. Moss seemed irritated at his refusal to change his mind. Mr. Weeks was never contacted or interviewed by internal affairs investigators.[20]

---

[20] The IAD report notes that Mr. Clemons was interviewed several hours after his arrest by non-department employees working in the Pretrial Release Office but it does not accurately state what Mr. Weeks recorded in his report. The IAD report notes that Mr. Weeks said in his report that he questioned Mr. Clemons regarding his general health and Mr. Clemons claimed his only health problem was asthma. The IAD report does not include the statement in Mr. Weeks' report that Mr. Clemons had a "bruise" or "bump."

Mr. Weeks' reaction after meeting with Mr. Moss was that "there's something weird going on. I think they don't want to – nobody wants to talk about the – what really happened to this gentleman when he was being interviewed by the police."

At the habeas hearing before the master, Mr. Moss was called as a witness by Mr. Clemons. Mr. Moss testified that he recalled having met with Mr. Weeks before Mr. Clemons' trial and that Mr. Weeks had made some references to Mr. Clemons' face being swollen. When asked if a witness who had seen Mr. Clemons' injury immediately after the police interrogation would have been important to the defense, Mr. Moss answered, "I don't know. I would assume so."

On August 6, 2013, the master issued his report, in which he concluded that the state had violated Mr. Clemons' constitutional rights under *Brady* by suppressing material inculpatory evidence corroborating Mr. Clemons' claim that his confession was coerced by the police. Based on his finding that Mr. Weeks' testimony was credible, the master concluded that the state had deliberately concealed Mr. Weeks' observation of Mr. Clemons' injury and suppressed the information he recorded in the pretrial release form by altering Mr. Weeks' record of his observation. The master further concluded that this evidence corroborated both Mr. Clemons' claim of police abuse made to the IAD

The IAD report concluded that Mr. Clemons' and Mr. Gray's allegations that they were physically abused by police were not substantiated because there was insufficient evidence to either prove or disprove the allegations. The IAD report further concluded that Mr. Clemons' allegation that the police had thrown away his first recorded statement was unfounded. Additionally, the IAD concluded that Mr. Clemons' and Mr. Gray's allegations that they had requested, but were denied, an attorney during questioning were unfounded.

and his family members' and attorney's testimony that they had observed injuries to Mr. Clemons' face. Moreover, the master found that this evidence could have contradicted and impeached Officer Williams' testimony that he did not observe any injuries to Mr. Clemons' face. Accordingly, the master held that Mr. Weeks' testimony may have resulted in the trial court sustaining Mr. Clemons' motion to suppress his confession and, therefore, could reasonably have put the case in a different light so as to undermine confidence in the verdict. On September 25, 2013, the master overruled the state's exceptions to his report and filed an amended report with the Court.

## Analysis

### I.    *Standard of Review for Master's Report*

In cases in which this Court appoints a master under Rule 68.03, the Court will sustain the master's findings and conclusions "unless there is no substantial evidence to support them, they are against the weight of the evidence, or they erroneously declare or apply the law." *State ex rel. Lyons v. Lombardi*, 303 S.W.3d 523, 526 (Mo. banc 2010); *see also Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). The master's findings should receive the "weight and deference which would be given to a court-tried case by a reviewing court" due to "the master's unique ability to view and judge the credibility of witnesses." *State ex rel. Woodworth v. Denney*, 396 S.W.3d 330, 336-37 (Mo. banc 2013) (internal quotations omitted). In light of this deference, "[t]his Court should exercise the power to set aside the findings and conclusions [of the master] on the ground that they are against the weight of the evidence with caution and with a firm belief that the conclusions are wrong." *Id.* at 337.

26

## II. Standard of Review for Habeas Relief

Habeas corpus relief is the final judicial inquiry into the validity of a criminal conviction and functions to relieve defendants whose convictions violate fundamental fairness. *Id.* A habeas petitioner has the burden of showing that the petitioner is entitled to habeas corpus relief. *State ex. rel. Winfield v. Roper*, 292 S.W.3d 909, 910 (Mo. banc 2009). "[A] writ of habeas corpus may be issued when a person is restrained of his or her liberty in violation of the constitution or laws of the state or federal government." *Woodworth*, 396 S.W.3d at 337 (internal quotations omitted).

The available relief under a writ of habeas corpus is limited and generally cannot be utilized to raise procedurally barred claims, such as those that could be raised on direct appeal or in a post-conviction proceeding. *Id.* Habeas corpus can provide relief even for procedurally barred claims if the petitioner can show:

> (1) a claim of actual innocence or (2) a jurisdictional defect or (3)(a) that the procedural defect was caused by something external to the defense— that is, a cause for which the defense is not responsible—and (b) prejudice resulted from the underlying error that worked to the petitioner's actual and substantial disadvantage.

*State ex rel. Zinna v. Steele*, 301 S.W.3d 510, 516-17 (Mo. banc 2010). Moreover, a petitioner may seek habeas relief for procedurally barred claims "in circumstances so rare and exceptional that a manifest injustice results." *State ex rel. Simmons v. White*, 866 S.W.2d 443, 446 (Mo. banc 1993); *see also State ex rel. Engel v. Dormire*, 304 S.W.3d 120, 125 (Mo. banc 2010).

Mr. Clemons seeks to overcome the procedural bar to his habeas corpus claim by showing "cause and prejudice." "To demonstrate cause, the petitioner must show that an

effort to comply with the State's procedural rules was hindered by some objective factor external to the defense." *Woodworth*, 396 S.W.3d at 337. The factual or legal basis for a claim must not have been reasonably available to counsel or some interference by officials must have made compliance impracticable. *Id.* Evidence that has been deliberately concealed by the state is not reasonably available to counsel and constitutes cause for raising otherwise procedurally barred claims in a petition for a writ of habeas corpus. *Amadeo v. Zant*, 486 U.S. 214, 222 (1988). Here, Mr. Clemons argues that he is entitled to a writ of habeas corpus because the state deliberately concealed Mr. Weeks' observation of an injury to Mr. Clemons' face and suppressed the information he recorded in the pretrial release form by altering Mr. Weeks' record of his observation (collectively, "the Weeks evidence").

Even though the master did not separately analyze whether Mr. Clemons established "cause" sufficient to overcome the procedural bar to his habeas claims, the master's findings and conclusions support the conclusion that Mr. Clemons has established sufficient cause. The master found that there was "no indication that the State ever informed the defense about what Weeks observed." This finding is consistent with the fact that the description of Mr. Weeks' report in Mr. Clemons' IAD report is misleading in that the description does not include Mr. Weeks' notation of a "bump" or "bruise" and, instead, notes that Mr. Weeks indicated that Mr. Clemons' only health problem was asthma. Additionally, while the state endorsed Mr. Weeks as a witness in a memorandum sent to Mr. Clemons' counsel on September 16, 1992, the state did not include the information that Mr. Weeks had observed that Mr. Clemons was injured.

28

Although Mr. Clemons knew of his own injuries and that Mr. Weeks inquired about an injury, Mr. Weeks did not tell Mr. Clemons that he was recording Mr. Clemons' injury in his pretrial release report, so Mr. Clemons could not have known that this material existed.

Additionally, although the state produced the pretrial release form, Mr. Weeks' record of Mr. Clemons' injury was scratched out. The master found Mr. Weeks' testimony that he had recorded his observations on the pre-release form credible and that, although it was not known who had scratched out the notation, "it had to be someone who [did] it on behalf of the State." The master concluded that the state had deliberately concealed the Weeks evidence.

The existence of a written record created by an employee of the board of probation and parole noting a significant injury to Mr. Clemons' face less than three hours after he was booked that was altered after the lead prosecutor for the state had knowledge of the report's content and attempted to get the author of the report to change his statements is substantial evidence in support of the master's conclusion that the state deliberately concealed the Weeks evidence and that this evidence was not, therefore, reasonably available to defense counsel due to an objective factor external to the defense. Accordingly, Mr. Clemons has established the cause needed to overcome the procedural bar to review of his habeas claim by showing that this evidence was not reasonably available to counsel because of a reason external to the defense.

Under the "cause and prejudice" standard, however, Mr. Clemons must also show "that he is entitled to habeas review because this Court's failure to review his claims

29

would prejudice him." *Engel*, 304 S.W.3d at 126. The determination of whether prejudice resulted from the underlying error under a cause and prejudice standard is identical to this Court's assessment of prejudice in evaluating Mr. Clemons' *Brady* claims. *Id.* If Mr. Clemons "establishes the prejudice necessary to support his *Brady* claims, he will have shown the required prejudice to overcome the procedural bar for habeas relief." *Id.* Accordingly, this Court turns to Mr. Clemons' claims of the state's *Brady* violations.

## III.    Brady *Violation Analysis*

In his claim, Mr. Clemons asserts that the state willfully violated *Brady* by failing to disclose the Weeks evidence to the defense. *Brady* holds that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. *Brady* was extended to hold that prosecutors have a duty to disclose *Brady* material that is not conditioned on a defendant's request for such material. *Banks v. Dretke*, 540 U.S. 668, 696 (2004) ("A rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process."). To prevail on his *Brady* claim, Mr. Clemons must show that: (1) the evidence at issue is favorable to him either because it is exculpatory or impeaching; (2) the evidence was, either willfully or inadvertently, suppressed by the state; and (3) he suffered prejudice as a result of the state's suppression. *Woodworth*, 396 S.W.3d at 338 (citing *Strickler v. Greene,* 527 U.S. 263, 281-82 (1999)).

In determining the materiality of the evidence to guilt or punishment and, therefore, prejudice, it is not required that the disclosure of the suppressed evidence would have ultimately resulted in the defendant's acquittal. *Woodworth*, 396 S.W.3d at 338; *Kyles v. Whitley,* 514 U.S. 419, 434 (1995)*.* A defendant is prejudiced by the suppressed evidence if the "favorable evidence is material" and "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles,* 514 U.S. at 433 (internal quotations omitted). According to the United States Supreme Court:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial.

*Kyles*, 514 U.S. at 434 (internal quotations omitted); *see also Woodworth*, 396 S.W.3d at 338.

### A. The Warren Weeks Evidence

In seeking habeas relief, Mr. Clemons asserts that the state violated his due process rights pursuant to *Brady* when it failed to disclose to the defense Mr. Weeks' observations of the injury to Mr. Clemons' face and the pretrial release form he prepared stating that Mr. Clemons had a "bump" or "bruise" on his face. Though Mr. Weeks was endorsed as a witness by the state in a memorandum sent to Mr. Clemons' counsel on September 16, 1992, the state failed to include any information regarding Mr. Weeks' observation of Mr. Clemons' injury or his record of the injury on the pretrial release

31

form.  For Mr. Clemons to prevail on his *Brady* claim, he is required to show that the Weeks evidence was favorable to his defense; that it was suppressed by the state; and that its suppression was prejudicial.  *Woodworth,* 396 S.W.3d at 338 (citing *Strickler,* 527 U.S. at 281-82).

### B.  *Evidence Favorable to the Defense*

The first *Brady* prong is whether the evidence of Mr. Weeks' observation of an injury to Mr. Clemons' face and his report documenting that observation was favorable to the defense either because it is exculpatory or impeaching.  Evidence is exculpatory if it is "material either to guilt or to punishment[.]"  *Brady*, 373 U.S. at 87.  Impeachment evidence is evidence that "affect[s] [the] credibility" of a witness.  *Giglio v. United States*, 405 U.S. 150, 154 (1972).  It is favorable to the accused "[w]hen the reliability of a given witness may well be determinative of guilt or innocence."  *Id.* (internal quotations omitted).  To be favorable, the evidence should "ha[ve] some weight" with a "tendency" to be favorable.  *Kyles*, 514 U.S. at 451.  The master determined that Mr. Clemons had presented substantial evidence that the Weeks evidence was favorable to the defense.  In reaching this conclusion, the master found especially significant this Court's findings in its review of Mr. Clemons' conviction and sentence in his direct appeal and the overruling of his motion for post-conviction relief.

During Mr. Clemons' suppression proceedings, he claimed that the police used physical force to coerce his confession, but his evidence supporting his claims was only the testimony of his family members and attorney and was without the benefit of testimony from an unrelated witness who was employed by the state.  *Clemons*, 946

32

S.W.2d at 218. This Court, in rejecting Mr. Clemons' assertion, emphasized the significance of the evidence presented and the testimony heard at the hearing on Mr. Clemons' motion to suppress his confession. *Id.* Specifically, this Court found that Mr. Clemons' witnesses could "not demonstrate either when or how [he] incurred any injury" because of: (1) the delayed timing of the witnesses' observations of Mr. Clemons' injury and (2) the credibility of the witnesses testifying on Mr. Clemons' behalf. *Id.*

First, this Court found the fact that the majority of witnesses testifying that they had observed injuries to Mr. Clemons' face following his interrogation by the police had seen Mr. Clemons "some 48 hours or more" after the interrogation, making it difficult to establish when or how the injury occurred. *Id.* The only testimony in Mr. Clemons' favor based on an earlier observation came from his former attorney, Michael Kelly, who had seen Mr. Clemons approximately 14 hours after Mr. Clemons' interrogation had ended. *Id.* Mr. Kelly stated that he had observed injuries to the right side of Mr. Clemons' face at that time. *Id.* The Court concluded, however, that Mr. Kelly's testimony was impeached by the testimony of Officer Williams, who had seen Mr. Clemons shortly *before* Mr. Kelly and who testified that he did *not* observe any sign of injury. *Id.* Second, though Mr. Clemons' family offered corroborating testimony of his injury, this Court noted that "[t]he trial court had the opportunity to judge the credibility of the witnesses and obviously found the state's witnesses' testimony more credible than [Mr. Clemons']." *Id.*

33

Based on this Court's reliance on the witnesses' testimony and its emphasis on the timing and credibility of those witnesses' observations of Mr. Clemons, the master determined that "the testimony by [Mr. Weeks] that he saw Mr. Clemons less than three hours after he was booked, and *more than eight hours before* Williams, could serve to contradict Williams" and impeach Mr. Williams' credibility. The master reached this conclusion especially "in light of the fact that – unlike the other defense witnesses who testified for Clemons on this issue – Weeks had no ties to Clemons." The master noted that Mr. Weeks' testimony would have lent substantial credibility to Mr. Clemons' claim that his confession was coerced because Mr. Weeks was a witness not related to Mr. Clemons and was without apparent cause to fabricate his observations. This is significant.

Much has been made of the fact that Mr. Williams was the ex-husband of a cousin of Mr. Clemons' mother. Little has been made of the fact that Mr. Williams was employed by the city of St. Louis as a police officer. In contrast, Mr. Weeks was employed by the state as a bond investigator for the board of probation and parole, so he was the only witness regarding Mr. Clemons' injury who did not have a potential bias either in favor of Mr. Clemons or in favor of the St. Louis police. Mr. Weeks' testimony was not, therefore, merely cumulative of the testimony of Mr. Clemons' family members and attorney. Evidence is not cumulative "when it goes to the very root of the matter in controversy or relates to the main issue, the decision of which turns on the weight of the evidence." *Black v. State*, 151 S.W.3d 49, 56 (Mo. banc 2004) (internal quotations omitted). Mr. Weeks' testimony offered an independent corroboration of Mr. Clemons'

34

allegation that the police beat him in which the credibility of this allegation turned exclusively on the weight of the evidence presented. *See id.; see also State v. Perry*, 879 S.W.2d 609, 613 (Mo. App. 1994).

In light of the deference given to the master's credibility findings, there is substantial evidence to support the master's conclusion that the undisclosed evidence from an objective, impartial witness corroborating Mr. Clemons' testimony was favorable to Mr. Clemons. Mr. Weeks' testimony would have provided the most immediate account of Mr. Clemons' physical appearance following his interrogation. The evidentiary value of the most immediate account of Mr. Clemons' appearance was made evident on direct appeal when this Court ultimately concluded that because Mr. Williams' observation of Mr. Clemons took place before Mr. Kelly's, Mr. Williams impeached Mr. Kelly. The credibility of the state's witnesses is further discredited by the evidence of the misleading description of Mr. Weeks' pretrial release report in the IAD report, the conduct of Mr. Weeks' supervisor and the prosecutor in attempting to convince Mr. Weeks to change his report, and the subsequent alteration of Mr. Weeks' report. Again, the courts must "consider the effect of all of the suppressed evidence along with the totality of the other evidence uncovered following the prior trial." *Woodworth*, 396 S.W.3d at 345. This evidence, considered in the totality of the circumstances, supports the master's conclusion that Mr. Weeks' observations of Mr. Clemons' injury, which occurred more than *eight hours* before Mr. Williams' observations, and his report would be favorable to corroborate Mr. Clemons' testimony

35

and impeach Mr. Williams' testimony. Additionally, this evidence may have led the trial court to sustain Mr. Clemons' motion to suppress his confession.

Mr. Clemons' confession included the only direct evidence that he was on the platform below the bridge when the sisters were pushed into the water, as well as evidence that the rapes were planned, the Kerry sisters were repeatedly struck on the face during the rapes, Mr. Richardson forced one of the sisters to perform oral sex, and both sisters were conscious and aware of what was happening, all of which likely would have influenced the jury's decision in sentencing Mr. Clemons to death. Though the state presented circumstantial evidence that Clemons was on the platform,[21] "[a] confession is like no other evidence" because it "is probably the most probative and damaging evidence that can be admitted against [a defendant]." *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (internal quotations omitted). Moreover, a defendant is prejudiced by a coerced confession admitted into evidence "[p]recisely because confessions of guilt, whether coerced or freely given, may be truthful and potent evidence[.]" *Lego v.*

---

[21] During the habeas hearing, Mr. Clemons asserted his Fifth Amendment privilege against self-incrimination in answering whether he: raped and/or assisted in raping the Kerry sisters; put one of the sisters and/or Mr. Cummins down the manhole; went down on the platform after the sisters and Mr. Cummins were placed there; forced the sisters and Mr. Cummins to get on the concrete pier; and told Mr. Gray and Mr. Winfrey that he "threw them off the bridge." The master stated that he drew an adverse inference from Mr. Clemons' refusal to answer these questions and "infer[red] . . . if he were *truthful*, Clemons' answers to every one of those questions would have been damaging to him." At trial, Mr. Clemons has a constitutional right to choose not to testify, and "the Constitution further guarantees that no adverse inferences are to be drawn from the exercise of this privilege." *Carter v. Kentucky*, 450 U.S. 288, 305 (1981). As such, Mr. Clemons' silence in response to these questions cannot factor into this Court's determination whether the suppression of the Weeks evidence would have prejudiced Mr. Clemons at trial. *See Carter*, 450 U.S. at 305.

*Twomey*, 404 U.S. 477, 483 (1972).   In admitting a coerced confession into evidence,  a defendant is "compelled to condemn himself by his own utterances" in violation of his constitutional right to due process of law.  *Id.* at 485.

Certainly, evidence that may have resulted in the trial court suppressing Mr. Clemons' damaging confession is evidence favorable to Mr. Clemons because it may have made "the difference between conviction and acquittal," *United States v. Bagley*, 473 U.S. 667, 676 (1985), or a death sentence and a sentence of life without parole. Contrary to the argument in the dissent, the Weeks evidence need not be sufficient to produce this result but need only be such that if used effectively "would have had some weight and its tendency would have been favorable" to Mr. Clemons.  *Kyles*, 514 U.S. at 451.

Additionally, even if the trial court were to continue to deny Mr. Clemons' motion to suppress, the Weeks evidence would be favorable to the defense at trial because it may have led the trial court to overrule the state's motion *in limine* to prohibit argument in closing by defense counsel that the police beat Mr. Clemons to coerce his confession. Before  closing argument, Mr. Clemons stated he intended to argue "that Clemons' face was swollen after the interrogation, and he was seen by a number of people, and . . . Cummins said he got hit."  The state objected, arguing that because the officers denied hitting Mr. Clemons and because Mr. Clemons did not take the stand to refute the officers, there was no reasonable inference that the police beat Mr. Clemons during the interrogation.   The court agreed, stating "there's no evidence that the police [beat Mr. Clemons]" because "he could have been hurt anywhere along the line."

37

But, if Mr. Clemons had called Mr. Weeks to testify at trial regarding his observations and record of Mr. Clemons' injury on the pretrial release form and the efforts of the supervisor and the prosecutors to convince Mr. Weeks to change his report, the Weeks evidence would have been significant to the court in its ruling. The Weeks evidence included Mr. Weeks' observations and record of Mr. Clemons' injury; Mr. Weeks' testimony that, after a conversation with his boss, Mr. Lukanoff, Mr. Weeks believed the police caused Mr. Clemons' injury; his conversations with his supervisor and the prosecutor during which they attempted to convince him to change his report; the alteration of the report by the state; and the failure of the IAD report to accurately describe Mr. Weeks' pretrial release report or include Mr. Lukanoff as a witness to Mr. Clemons' condition at the time of the pretrial release interview. Together this evidence supports a reasonable inference that Mr. Clemons was beaten by the police during his interrogation.

Mr. Weeks' testimony also would have independently supported Mr. Clemons' claim that his confession was not voluntary because it was physically coerced. This is significant given that jury instruction 27 instructed the jury to disregard and "give no weight in your deliberation" to the statement if they did not believe it was freely and voluntarily made.

The master's conclusion that the suppressed evidence would have been favorable to Mr. Clemons is supported by substantial evidence, and this Court adopts the master's findings as to first prong of *Brady*.

*C. Failure to Produce* **Brady** *Material*

The second *Brady* prong is whether the state failed to produce the favorable Weeks evidence to the defense. Although it does not matter whether the failure was willful or inadvertent, *Brady*, 373 U.S. at 87, after completing his exhaustive review of the evidence and trial record and after assessing the credibility of witnesses at the September 2012 hearing, the master found that the state deliberately failed to produce the favorable Weeks evidence to Mr. Clemons.

The master "believed Weeks when he testified that he recorded his observations of Clemons on the Pretrial Release Form." The master concluded that the pretrial release form completed by Mr. Weeks had been altered and, while it was uncertain exactly who had crossed out the description of Mr. Clemons' injury, "it had to be someone who had [done] it on behalf of the state." The master found that there was no indication that the state ever informed the defense of Mr. Weeks' recorded observations or of his oral statements of those observations, noting at the very least, even in the absence of the pretrial release form, Mr. Clemons could have called Mr. Weeks as a witness at trial to provide oral testimony of his observations of Mr. Clemons' injury. Based on these determinations, the master concluded that Mr. Clemons has, indeed, satisfied the second element of *Brady* by proving that the state suppressed the Weeks evidence from the defense.

Due to the master's unique ability to view and judge the credibility of witnesses, this Court will uphold the master's findings and conclusions so long as they are supported by substantial evidence. In light of the master's credibility determination, this Court's

39

deference to that determination, and the evidence showing that the state intentionally took steps to hide Mr. Weeks' corroborative testimony from Mr. Clemons by attempting to convince Mr. Weeks to change his report to prevent further reporting of Mr. Clemons' injury; altering his record of the injury on the pretrial release form; and failing to disclose the Weeks evidence to Mr. Clemons, this Court adopts the master's findings and conclusions that Mr. Clemons satisfied the second prong of *Brady*.

### D. Prejudice from non-disclosure

In the third and final prong of *Brady*, Mr. Clemons must prove that his defense was prejudiced by the state's failure to disclose the Weeks evidence. In determining prejudice, as noted, Mr. Clemons does not have to demonstrate that the state's disclosure of the evidence would have ultimately resulted in Mr. Clemons' acquittal. *Woodworth*, 396 S.W.3d at 338. "[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal[.]" *Kyles*, 514 U.S. at 434. Rather, it is enough if the defendant shows "a 'reasonable probability' of a different result[.]" *Woodworth,* 396 S.W.3d at 338 (quoting *Kyles,* 514 U.S. at 434).

A "reasonable probability" of a different result is shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." *Bagley,* 473 U.S. at 678. In *Kyles*, the Supreme Court found that "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a *fair trial*, understood as a trial resulting in a verdict worthy of confidence." 514 U.S. at 434 (emphasis added). Importantly, this Court

must analyze "the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response." *Bagley*, 473 U.S. at 683.

In his review, the master determined that Mr. Clemons satisfied the prejudice prong of *Brady*. In so finding, the master once again noted this Court's prior ruling affirming the trial court's denial of Mr. Clemons' motion to suppress his confession on the basis of Officer Williams' testimony at the hearing on the motion to suppress. *See Clemons*, 946 S.W.2d at 218. Mr. Weeks' interview with Mr. Clemons took place only three hours after he was booked, significantly closer to the time of the police interrogation than the visit by Officer Williams, in which no injuries were purportedly observed.

Here, the fact that the trial court denied Mr. Clemons' claim in his motion to suppress that his confession was physically coerced and allowed into evidence Mr. Clemons' confession without having the benefit of Mr. Weeks' testimony substantially supports the master's finding that Mr. Clemons was not given a "fair trial." This is particularly true in light of the fact the trial court's primary basis for not suppressing Mr. Clemons' confession was because Mr. Clemons could not prove at whose hands and when he suffered his injury. As noted by the trial court at the hearing on the motion to suppress, it believed "he could have been hurt anywhere along the line."

Additionally, Mr. Weeks' observations were consistent with and corroborate the testimony of Mr. Clemons, his family members, his attorney, and the hospital records as

41

to the cause, timing and extent of Mr. Clemons' injury. This testimony would have provided the court with the most immediate account of Mr. Clemons' appearance – nearly eight hours before Officer Williams and long before any of the other defense witnesses who observed injuries to Mr. Clemons – serving to both undermine the theory that Mr. Clemons self-inflicted his injuries and serving to impeach the testimony of Officer Williams that he observed no injuries. Accordingly, the proximity of Mr. Weeks' interview to Mr. Clemons' police interrogation as compared with Officer Williams' visit impeaches the testimony of Officer Williams. This impeaching and credible testimony, concluded the master, may have led the trial court to sustain Mr. Clemons' motion to suppress.[22]

The master's conclusion that Mr. Clemons' confession may well have been suppressed if the Weeks evidence had been available at the suppression hearing is well founded as there is convincing evidence that Mr. Clemons was beaten to confess. When a defendant challenges the admissibility of a confession due to allegations of physical

---

[22] The dissent states "there is no likelihood that the trial court would have been swayed" by the Weeks evidence even if it had been presented at the motion to suppress hearing. As the dissent notes, the trial court found the police officers' testimony credible. However, as the dissent also notes, a trial court's credibility findings are to be made after considering the reasonableness of the witness's testimony in light of all the evidence in the case and whether the testimony may have been influenced by the witness's interest, bias or prejudice. In this case, the trial court's credibility findings as to the officer's testimony were made without the benefit of the Weeks evidence. By suppressing the Weeks evidence – the only evidence from a neutral party that supported Mr. Clemons' claim that his confession was coerced – the state denied the trial court the opportunity to determine the reasonableness of the officers' testimony and their credibility in light of the Weeks evidence. The totality of the evidence that the trial court will consider on remand will include the Weeks evidence and, therefore, it is likely that the trial court's credibility findings will not be the same.

coercion, the state has a burden to show by a preponderance of the evidence that the confession was voluntary. *State v. Johnson*, 207 S.W.3d 24, 45 (Mo. banc 2006). The United States Supreme Court states:

> The test for voluntariness is whether, under the totality of the circumstances, the defendant was deprived of free choice to admit, to deny, or to refuse to answer and whether physical or psychological coercion was of such a degree that the defendant's will was overborne at the time he confessed.

*Id.* (internal quotations omitted).

It is known that Mr. Cummins, the victim, made strikingly similar allegations of restraint during the abuse by the police, as did Mr. Gray. All three men reported they were instructed to sit on their hands before being struck by the police officer, a unique tactic of restraint by the police. Mr. Clemons and Mr. Gray reported this unique method of restraint to the IAD investigators within two days of their interrogations. While it might be possible that Mr. Clemons and Mr. Gray colluded to create stories with the same unique manner of restraint, there is no likelihood that they colluded with Mr. Cummins. And it would strain credulity to suggest that it is a coincidence that Mr. Cummins testified to the same unique manner of restraint during his interrogation.

Like Mr. Clemons, Mr. Gray subsequently confessed after alleging he was physically abused. Mr. Cummins' and Mr. Gray's allegations of unique circumstances during the physical abuse, plus Mr. Weeks' testimony that both impeaches Officer Williams and lends substantial credibility to Mr. Clemons' testimony, is credible evidence that Mr. Clemons' will was overborne at the time of his confession and that his confession should have been suppressed. The evidence supports the master's conclusion

that there was a reasonable probability of a different result at Mr. Clemons' trial if the jury had never heard Mr. Clemons' confession.

As discussed above, a defendant's confession is highly probative evidence. *State v. Seibert*, 93 S.W.3d 700, 709 (Mo. banc 2002) (Benton, J. dissenting). A jury may be unable "to ignore the probative value of a truthful but coerced confession" and may, therefore, be unduly "influenced by the reliability of a confession it considered an accurate account of the facts" when judging the voluntariness of the confession. *Lego*, 404 U.S. at 483. Mr. Clemons' confession, introduced at trial and presented again to the jury in written and audio form during their sentencing deliberations, provided the jury with the only direct evidence that he was on the platform below the bridge at the time the Kerry sisters were pushed to their death. Neither Mr. Cummins nor Mr. Winfrey stated that Mr. Clemons was on the platform with Mr. Richardson when the Kerry sisters were pushed. Though other circumstantial evidence was presented, Mr. Clemons' confession was "the most probative and damaging evidence that [could] be admitted" against him. *Fulminante,* 499 U.S. at 296. In addition to Mr. Clemons' confession being the only direct evidence placing Mr. Clemons on the platform, the confession also provided disturbing details of Mr. Clemons' rape of the Kerry sisters, which likely would have influenced the jury's decision in sentencing Mr. Clemons to death.

The master expressly stated that he believed that Mr. Clemons satisfied the *Brady* materiality standard such that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Notably, the master does not limit his conclusion to the result of the suppression hearing

but correctly extends his lack of confidence to the *whole case*, including the guilt and sentencing phase.

Accordingly, Mr. Clemons was denied a fair trial not only because the state's suppression of the Weeks evidence prejudiced Mr. Clemons at the hearing on the motion to suppress his confession but also because the jury was not able to hear Mr. Weeks' testimony in determining whether his confession was voluntary. In this regard, even if the trial court did not suppress Mr. Clemons' confession, it is reasonably probable that the Weeks evidence would have led the trial court to rule against the state's motion *in limine* and allow defense counsel to argue during closing arguments that Mr. Clemons' confession was coerced. The trial court's rationale for prohibiting this argument was that there was no evidence at trial that Mr. Clemons' had been beaten to confess. Mr. Weeks' credible testimony would have provided evidence to support the reasonable inference that he was beaten.

Moreover, the jury would have been able to consider Mr. Weeks' testimony while deliberating on whether Mr. Clemons' confession was freely and voluntarily made as required by jury instruction 27. With both Mr. Clemons' closing argument that he was beaten and the Weeks evidence before the jury, it is reasonably probable that the jury would have found Mr. Clemons' statement was coerced. Had the jury found Mr. Clemons' statement was coerced, as required by jury instruction 27, it would have had to disregard it and give it no weight during deliberations because the confession was not freely and voluntarily made.

The state attempts to refute the master's conclusion that Mr. Clemons was prejudiced by the state's suppression of the Weeks evidence by first arguing that even if Mr. Clemons' confession would have been suppressed, harmless error would protect the verdict because of the weight of evidence presented at trial establishing Mr. Clemons' guilt. The state's argument, however, is meritless in light of the United States Supreme Court's holding in *Kyles* that once a *Brady* violation has been found, "there is no need for further harmless-error review." *Kyles,* 514 U.S. at 434. Such an error cannot "be treated as harmless, since [there is] a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," which "necessarily entails the conclusion that the suppression must have had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 435 (internal quotations omitted). Accordingly, harmless-error analysis cannot be used to protect the trial court's verdict.

The state also attempts to refute the master's finding of prejudice by alleging Mr. Clemons misapplies the law by expanding the application of the *Strickland v. Washington* standard of prejudice to the outcome of rulings on motions. 466 U.S. 668, 695 (1984). According to the state, *Strickland* is limited to the outcome of the trial and the master improperly extends it to include the outcome of Mr. Clemons' hearing on his motion to suppress. Neither the United States Supreme Court nor this Court have previously stated whether *Brady* applies to suppression hearings.[23] Here, however, it is

---

[23] Federal circuits are split on this point. *See United States v. Harmon*, 871 F. Supp. 2d 1125, 1151-52 (D.N.M. 2012), *aff'd by United States v. Harmon*, 742 F.3d 451 (10th Cir.

not necessary to determine whether *Brady* would apply to all suppression hearings. The Weeks evidence would have been admissible at trial, not just at the suppression hearing, so the application of *Brady*, here, is not limited to the suppression hearing. In this circumstance, the analysis of prejudice and whether there is "a 'reasonable probability' of a different result" due to the state's *Brady* violation extends to the evaluation of the outcome of both the suppression hearing and the trial.

In a similar argument, the state asserts the master failed to properly apply *Strickland.* The state contends that the master did not apply the "reasonable probability" standard of prejudice articulated in *Strickland* but rather some lesser standard as indicated in his statement that the Weeks evidence "may have resulted in the trial court sustaining the motion to suppress." After careful review of the entirety of the master's legal analysis, this Court finds that the master's findings and conclusions do not erroneously declare or apply the law. In its argument, the state ignores the master's initial analysis of the prejudice prong where he articulates the correct legal standard, noting that "Clemons does not have to demonstrate that disclosure of Weeks' knowledge of injury and the

---

2014) ("Circuit courts have split on the issue whether *Brady v. Maryland's* restrictions apply to suppression hearings[.]"). The Fifth and Ninth Circuits have held that *Brady* applies to suppression hearings. *See Smith v. Black*, 904 F.2d 950, 965-66 (5th Cir. 1990), *vacated on other grounds by Smith v. Black*, 503 U.S. 930 (1992); *United States v. Barton*, 995 F.2d 931, 935 (9th Cir. 1993). The Fourth and Seventh Circuits have assumed that *Brady* would apply to suppression hearings but have declined to decide the issue based on the facts presented in the cases. *United States v. Williams*, 10 F.3d 1070, 1077 (4th Cir. 1993); *United States v. Stott*, 245 F.3d 890, 902 (7th Cir. 2001). The District of Columbia Circuit, the Sixth Circuit and Tenth Circuit have questioned whether *Brady* applies to suppression hearings but also have declined to decide the issue. *United States v. Bowie*, 198 F.3d 905 (D.C.C. 1999); *United States v. Taylor*, 471 F. App'x 499, 520 (6th Cir. 2012); *United States. v. Dahl*, 597 F. App'x 489, 491 n2 (10th Cir. 2015).

47

obscured form would have resulted ultimately in [Clemons'] acquittal." (Internal citations omitted). Instead, the master correctly observed that, "it is enough if there is a *reasonable probability* of a different result," (emphasis added) and "[t]his element is satisfied 'when the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict.'" (Internal citations omitted). In the very next sentence of his report, the master plainly states his finding on the issue: "I believe Clemons has satisfied that standard." Accordingly, it is clear that the master indeed understood and applied the "reasonable probability" standard as articulated in *Strickland* to find that Mr. Clemons has satisfied the prejudice prong of *Brady*.

As previously stated, this Court gives deference to the master's finding of prejudice because of the master's unique ability to view and judge the credibility of witnesses. *Woodworth*, 396 S.W.3d at 336-37. This Court will only set aside the master's findings if they are against the weight of the evidence and, even then, will only do so "with caution and with a firm belief that the conclusions are wrong." *Id.* at 337. In other words, this Court will sustain the master's findings "unless there is no substantial evidence to support them." *Id.*

As detailed above, substantial evidence exists to support the master's findings and conclusion that Mr. Clemons was prejudiced because of the state's suppression of the notation of "bruise" or "bump" in Mr. Weeks' pre-release report and his observations of Mr. Clemons' injury. The record includes substantial, credible evidence that Mr. Clemons' confession was coerced by physical abuse inflicted by the police that would require that his confession be suppressed. As such, this Court accepts that

Mr. Clemons has demonstrated that the state's suppression of the favorable evidence of Mr. Weeks' observations and recordings was prejudicial. Considering the effect that the Weeks evidence may have during the suppression hearing and at trial, along with the effect Mr. Clemons' confession likely had during both the guilt and the penalty phase of his trial, there is a reasonable probability of a different result either in Mr. Clemons' conviction or sentence. Therefore, Mr. Clemons was prejudiced and did not receive a fair trial with a verdict worthy of confidence.[24] Additionally, because Mr. Clemons has established the prejudice necessary to support his *Brady* claim, he has also shown the required prejudice to overcome the procedural bar for habeas relief. *See Engel*, 304 S.W.3d at 126.

Overall, the master found that Mr. Clemons met all three elements of his *Brady* claim by showing that the Weeks evidence was materially favorable evidence; that it was either willfully or inadvertently suppressed by the state; and that its suppression was prejudicial. In making this determination, the master reviewed thousands of pages of record, heard multiple days of testimony during which he could evaluate the credibility of the witnesses, and, ultimately, submitted his findings to this Court in an official report. After a thorough analysis of the evidence and legal analysis used by the master, this Court finds the master's findings and conclusions are supported by substantial evidence,

---

[24] The dissent argues that there is overwhelming evidence of Mr. Clemons' guilt and so there is no likelihood that a jury would not have found Mr. Clemons guilty or would have imposed a sentence other than death. With similar evidence, a jury did, however, find Mr. Clemons' codefendant, Mr. Richardson, guilty of one count of first-degree murder and one count of second-degree murder and was unable to agree whether to sentence Mr. Richardson to death. *State v. Richardson*, 923 S.W.2d 301, 308 (Mo. banc 1996).

are not against the weight of the evidence, and correctly declare and apply the law. This Court accepts the master's conclusions with a firm belief that they are correct and holds that Mr. Clemons has successfully proven the right to a new trial due to the state's violation of the principles of due process and the standards of justice, as outlined in *Brady*.

## IV. Proportionality Review

In his second claim for habeas relief, Mr. Clemons asserts that his death sentence is disproportional due to his age and lack of criminal record, new evidence that his confession was coerced, evidence that he did not directly murder the Kerry sisters but only acted as an accomplice, and the reduced sentence of his "more culpable" codefendant, Mr. Richardson. Because this Court reverses Mr. Clemons' convictions and sentences for the state's violation of his due process rights as recognized in *Brady*, Mr. Clemons' proportionality claim will not be addressed.

## Conclusion

After days of hearings and an extensive review of the case, the master concluded that the state deliberately failed to disclose evidence favorable to the defense. The testimony from Mr. Weeks, an employee of the board of probation and parole, regarding injuries to Mr. Clemons' face within a short time after being interrogated by police was independent evidence that he was beaten and coerced to give an audiotaped confession that included incriminating evidence, particularly that he admitted being on the platform under the bridge when Julie and Robin Kerry were pushed to their deaths. Additional evidence of improper conduct by officials handling Mr. Clemons' case was Mr. Weeks'

50

testimony that one of his supervisors and the lead prosecutor in the case attempted to convince him to change his written report of the injury and, despite his refusal, the report was altered to redact any reference to the injury.

The master also determined that the state's failure to disclose this evidence prejudiced Mr. Clemons. The master found that the testimony of Mr. Weeks, who interviewed Mr. Clemons less than three hours after he was booked, would have served to contradict and impeach the testimony of the state's witness, Officer Williams, who testified that he did not observe injuries to Mr. Clemons more than 12 hours after the interrogation.

The Weeks evidence would also have been significant to the court in its ruling to prohibit defense counsel from arguing during closing arguments that police beat Mr. Clemons to confess, as would the evidence that Mr. Cummins had similarly testified that police physically abused him to confess. Additionally, the credibility of the police officers' testimony that they did not beat Mr. Clemons and coerce his confession is further impeached by evidence that the manner in which Mr. Clemons claimed he was beaten included the unique command to sit on his hands, which was identical to a command given to the victim, Mr. Cummins, when he was beaten by the police in an attempt to get him to confess. Finally, there is evidence that police officers investigating the murders falsified a report to state that Mr. Cummins had admitted that he had sexual desires for Julie, that he had tried to have sex with Julie the night of the murders and when she refused had pushed her, causing her to lose her balance and fall off the bridge, and that he had run off the bridge.

The master concluded that the suppressed Weeks evidence along with the totality of other evidence showed cause and prejudice sufficient to undermine confidence in the outcome of the trial, resulting in a *Brady* violation by the state. This determination is supported by substantial evidence and does not erroneously declare or apply the law. This Court, therefore, adopts the master's recommendation, and vacates Mr. Clemons' convictions and sentences for first-degree murder. Within 60 days from the date the mandate issues in this case the state may file an election in the circuit court to retry him. If the state so elects, the new trial shall be held expeditiously. If the state does not so elect, the case against Mr. Clemons shall be dismissed and Mr. Clemons shall be discharged on this matter.

_____
PATRICIA BRECKENRIDGE, CHIEF JUSTICE

Stith and Teitelman, JJ., and Hardwick, Sp.J.,
concur; Wilson, J., dissents in separate opinion
filed; Fischer and Russell, JJ., concur in opinion
of Wilson, J. Draper, J., not participating.



# SUPREME COURT OF MISSOURI
## en banc

STATE ex rel. REGINALD CLEMONS,    )
                                                  )
                     Petitioner,       )
                                                  )
v.                                               )       No.  SC90197
                                                  )
STEVE LARKINS, SUPERINTENDENT,    )
                                                 )
                     Respondent.     )

## DISSENTING OPINION

The central question addressed in the principal opinion is whether, under *Brady v. Maryland*, 373 U.S. 83 (1963), Clemons' claim that the state failed to disclose Probation Officer Weeks' subjective impression of Clemons' physical condition – an impression that Weeks formed several hours ***after*** Clemons claims two police detectives beat him into giving an audiotaped statement – is a sufficient ground to vacate Clemons' convictions and death sentences now, more than 20 years after his trial. It is not. There was no failure to disclose in this case. The state produced to the defense Weeks' name, his job, and the document on which Weeks supposedly noted this observation long before trial. More importantly, Clemons already knew about Weeks' impression because Weeks remarked to Clemons about it at the time.

Even if the state had not disclosed all of this before trial, which it did, Clemons fails to show the type of nondisclosure that, under *Brady*, requires relief. *Brady* only

applies to two types of evidence: exculpatory evidence concerning guilt or punishment, and impeachment evidence concerning the credibility of a witness who might be determinative of guilt or punishment. Weeks' evidence is neither. Weeks' subjective impression of Clemons' appearance formed hours after Clemons' interrogation ended has no bearing on whether his audiotaped statement was voluntary. Instead, as Special Master Michael Manners found (and the principal opinion agrees), Weeks' evidence merely impeaches the credibility of other ancillary witnesses who corroborated the detectives' denials at the suppression hearing by testifying that Clemons did not appear injured in the hours and days after he gave his statement. Accordingly, Weeks' evidence is not the sort of evidence to which *Brady* applies.

Finally, even if Weeks' evidence qualified as exculpatory or impeachment evidence under *Brady*, Clemons is not entitled to relief unless that evidence was material, i.e., unless there is a reasonable probability that the jury's verdicts would have been different had the evidence been disclosed. To establish materiality, Clemons makes a two-step argument: (1) there is a reasonable probability that, if the trial court had heard Weeks' evidence, it would have suppressed Clemons' audiotaped statement; ***and*** (2) there is a reasonable probability that, if the jury had not heard Clemons' statement, it would not have convicted him and recommended that he be sentenced to death. Any fair reading of the Master's Amended Final Report (the "Report") shows that the Master never reached this second step and, if he had, that Clemons' claim would have failed.

The Master spends most of the first 100 pages of the Report reviewing the records of Clemons' trial (and the trials of Clemons' accomplices Gray and Richardson), together

2

with the records of Clemons' state post conviction proceedings and federal habeas review. Only after conducting this exhaustive analysis did the Master draw his conclusion regarding the Weeks *Brady* claim. Clemons quotes bits and pieces of the Master's critical conclusion, but that approach fails to do justice to the Master's Report. Instead, to avoid any distortion, the Master's conclusion is set forth below, in its entirety:

> Clemons does not have to demonstrate that disclosure of Weeks' knowledge of injury and the obscured form "would have resulted ultimately in [Clemons'] acquittal." *Woodworth*, 396 S.W.3d at 338. It is enough if there is a reasonable probability of a different result. *Ibid*. This element is satisfied "when the favorable evidence could reasonably be taken to put the whole case in such different light as to undermine the confidence in the verdict." *Engel v. Dormire, supra*, 304 S.W.3d at 128.
>
> I believe Clemons has satisfied that standard. The importance of Warren Williams' testimony was emphasized by this Court in its original Opinion, affirming the trial court's denial of the motion to suppress Clemons' confession, 944 S.W.2d at 218. The contradiction of his testimony by Weeks is a method of impeachment. *Maugh v. Chrysler Corp.*, 818 S.W.2d 658, 661 (Mo. App. 1991). In the criminal case, **Weeks' testimony may have resulted in the trial court sustaining the motion to suppress**, in which case, Clemons' confession would never have been heard by the jury.
>
> The state has suggested that harmless error would protect the jury verdict, even if Clemons' confession had been suppressed. It seems to me that the State's argument is contrary to *Kyles v. Whitley*, 514 U.S. 419, 434 (1995), where the Supreme Court held that once a violation of *Brady* and its progeny is shown, "there is no need for further harmless-error review."
>
> This is a troubling outcome for me, because we do not know if Weeks' recollection of the evidence is consistent with other people in the Pretrial Release Unit, for example, Commissioner Edwards, who, according to the IAD Report, observed no injuries to Clemons at 5:49 a.m. **I am dubious that the suppression of Clemons' statement would have made much difference in this case, due to the strength of the evidence,** but the holding of *Kyles*, supra, would seem to suggest that the question of harmless error is not pertinent where there is a Brady violation.

Master's Report, at 103-104 (emphasis added).

3

As an experienced jurist and accomplished wordsmith, the Master is entitled to have the language of his conclusion read with precision and care. Concerning the first step of Clemons' argument, the Master concluded that the disclosure of Weeks' evidence "***may have resulted***" in the trial court suppressing Clemons' statement. Report at 103 (emphasis added). This is insufficient. *See Strickler v. Greene*, 527 U.S. 263, 289 (1999) (holding that a reasonable probability that the undisclosed evidence "might have" altered the outcome is insufficient because *Brady* requires a reasonable probability that the undisclosed evidence "would have" altered the outcome).

More importantly, the Master determined that he was not permitted to address the second step of the materiality analysis (i.e., whether there is a reasonable probability that, if Clemons' statement had been suppressed, the jury would not have convicted him and recommended that he be sentenced to death). The Master declined to reach this second step based on his understanding of *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). In characteristically unambiguous language, however, the Master proceeded to tell this Court precisely what conclusion he would have reached if he had proceeded to this second step: "***I am dubious that the suppression of Clemons' statement would have made much difference in this case, due to the strength of the evidence***" against Clemons. Report at 104 (emphasis added). This statement is critically important because the Master misconstrued – or, more likely, was misinformed about – the holding in *Kyles*.

*Kyles* does not hold that courts must ignore the strength of the evidence against defendant when deciding whether undisclosed evidence was material for *Brady* purposes. Just the opposite. *Kyles* affirms that there is no violation of due process under *Brady*

4

unless and until the defendant shows a reasonable probability that disclosure of the withheld evidence would have resulted in a different verdict on guilt or punishment. *Kyles*, 514 U.S. at 437. That showing cannot be made when the case against the defendant remains overwhelming, even when viewed in light of the undisclosed evidence. *Id.* To make the required showing of materiality, therefore, the defendant must show that the remaining evidence is not overwhelming. Accordingly, *Kyles* merely draws the logical conclusion that – once the defendant shows that the undisclosed evidence was material (i.e., that the evidence of guilt was not overwhelming) – the state's failure to disclose that evidence can never be considered "harmless." *Id.* In context, there can be no doubt that *Kyles* confirms the central importance under *Brady* of evaluating the weight of the remaining evidence against the defendant because the bulk of the Court's decision is devoted solely to that question. *Id. See also Smith v. Cain*, 132 S. Ct. 627, 630 (2012) (undisclosed impeachment evidence "***may not be material if the State's other evidence is strong enough*** to sustain confidence in the verdict") (emphasis added).

If the Master reached the second step of Clemons' materiality argument, as *Kyles* and *Smith* say he should have done, he made it clear that he would have denied Clemons' *Brady* claim. Even if Clemons' audiotaped statement had been suppressed, the Master stated that there was no reasonable probability that the jury's verdicts would have changed because the other evidence against Clemons was so strong. No other reading of the Report is faithful to the Master's painstaking review and analysis of the evidence

establishing Clemons' guilt and punishment, and no other reading of *Kyles* is faithful to that decision and the Supreme Court's subsequent *Brady* cases.

If the Court is not convinced that this is the conclusion the Master would have drawn if he had reached the necessary second step of the *Brady* materiality analysis (and it is not convinced by the other independent and adequate grounds to deny relief), the answer is not to vacate Clemons' conviction. Instead, the only reasonable answer is to remand the case to the Master for the limited purpose of having him apply the proper legal standard to the facts he already has found and thoroughly analyzed throughout the Report. What is not reasonable, however, is for the Court to put words in the Master's mouth by purporting to affirm a conclusion he did not make.

## I.     *Litigation – Past and Present*

In 1993, Clemons was convicted of murdering Julie and Robin Kerry and given two death sentences. All of his claims of error were rejected by this Court, *State v. Clemons*, 946 S.W.2d 206 (Mo. banc 1997), and the Supreme Court of the United States declined to review those claims, 522 U.S. 928 (1997). All claims that Clemons could have raised and did not raise in this appeal were waived. *Matthews v. State*, 175 S.W.3d 110, 115 (Mo. banc 2005).

Rule 29.15 provided Clemons with the "exclusive procedure" for raising claims that his death sentences exceeded the maximum punishment allowed by law, that the trial court lacked jurisdiction to impose those sentences, or that his convictions or sentences resulted from a violation of his rights under the state or federal constitutions. Rule 29.15(a). With the help of new lawyers, Clemons asserted more than 25 of these "post

6

conviction" claims and acknowledged that, pursuant to Rule 29.15(d), he was waiving all claims other than those he raised. After extensive discovery and a hearing, Clemons' Rule 29.15 motion was overruled. This Court affirmed that decision, *Clemons*, 946 S.W.2d at 221, and the Supreme Court declined to review Clemons' post conviction claims. 522 U.S. 928 (1997).

Clemons then moved to the federal courts. There, another new group of lawyers challenged many of this Court's rulings and asserted various new claims that had never been presented to this or any other state court. After more discovery and another hearing, the federal district court denied all of Clemons' claims – save one. *Clemons v. Luebbers*, 212 F. Supp. 2d 1105, 1122 (E.D. Mo. 2002) (vacating Clemons' death sentences because certain jurors were excluded who stated they could not sentence Clemons to death if he did not actually push one of the two victims to her death). On appeal, however, that claim – and all of the others – were denied, *Clemons v. Luebbers*, 381 F.3d 744 (8th Cir. 2004), and the Supreme Court declined to review those claims, 546 U.S. 828 (2005).

The trail of litigation described above leads to Clemons' current petition for writ of habeas corpus, which was filed in this Court on June 12, 2009 (the "2009 Petition"). Given Clemons' many opportunities to litigate his claims (all of which have been denied at least twice, and some as many as four times), and given that he long ago waived all unasserted claims, one may reasonably ask, "What's left?" The answer, properly, is: "Not much."

7

First, an inmate is entitled to relief – even at this late date – if he discovers "new evidence" (i.e., evidence that was not – and through the exercise of reasonable diligence could not have been – known earlier) constituting "clear and convincing" proof that he did not commit the crimes.[1] *State ex rel. Amrine v. Roper*, 102 S.W.3d 541, 548 (Mo. banc 2003). This type of claim is referred to as a "freestanding" claim of actual innocence because the inmate does not have to show that his conviction resulted from a constitutional violation. Clear and convincing proof of actual innocence, standing alone, is sufficient to merit relief. *Id*.

An inmate may also raise a new constitutional claim at this point if, but only if, the inmate can establish an adequate excuse for failing to raise the claim earlier. There are only two such excuses: (1) proof of actual innocence that, though it does not meet the *Amrine* standard of "clear and convincing," is sufficient to show that the inmate's actual innocence is "more likely than not," *Sclup v. Delo*, 513 U.S. 298, 315 (1995); or (2) proof that there was both (a) an external "cause" that prevented the inmate from asserting the claim earlier and (b) extraordinary "prejudice" that resulted from the constitutional violation, *Murray v. Carrier*, 477 U.S. 478, 485-87 (1986). Accordingly, after all state and federal reviews are finished, an inmate can only assert a new constitutional claim if

---

[1] Once an inmate has exhausted his rights to trial, to direct appeal, to move for post conviction relief, to appeal if that motion is overruled, and to further review in the federal trial and appellate courts, a compelling argument can be made that no conviction should ever be set aside except upon a clear and convincing showing of actual innocence. *See Clay v. Dormire*, 37 S.W.3d 214, 218 (Mo. banc 2000) ("actual innocence component is all the more appropriate for Missouri cases given the fact that defendants are already afforded an initial habeas-like post-conviction relief proceeding … in which constitutional claims … like those that so often appear in habeas corpus petitions may be presented").

he can pass through either the gateway of "actual innocence" or the gateway of "cause and prejudice."

In the 2009 Petition, Clemons raises only the first category of claims, i.e., a so-called "freestanding" claim of actual innocence. By the time final arguments were presented to the Master, however, Clemons was asserting new constitutional claims under both the "actual innocence" and "cause and prejudice" gateways. These claims are addressed separately below.[2]

## II.     *Freestanding Claim of Actual Innocence*

In the 2009 Petition, Clemons identifies the following "new evidence" to support his claim of actual innocence: (1) a 1993 civil suit against the City of St. Louis by Thomas Cummins (the only victim to survive the encounter with Clemons and his accomplices on the Chain of Rocks Bridge) in which Cummins alleges that police detectives assaulted him in an effort to make him confess that he – not Clemons and the three other strangers Cummins described in his initial recorded statements – was responsible for the deaths of Julie and Robin Kerry; and (2) a 1995 settlement payment from the City in the amount of $150,000 to resolve Cummins' lawsuit. This "new

---

[2]   Ironically, the principal opinion asserts that Clemons' actual innocence claim – the only claim that he raised in his petition – is not "preserved." At the same time, however, the claim on which the principal opinion grants relief was never pleaded. In fact, the only document that might indicate whether – and how – such a claim was even argued to the Special Master is the transcript of the oral arguments to the Master on March 18, 2013. That transcript is not part of the record before this Court.

9

evidence," Clemons claims, constitutes "clear and convincing" proof that he is innocent. This is the claim – the only claim – that the Master was appointed to hear.[3]

### A. "Cummins Did It" – the (Nearly) Final Refrain

At trial, Clemons (like Gray, who was tried and convicted before Clemons) relied heavily on a defense theory that attempted to portray Cummins as the sole perpetrator of these crimes. The cornerstone of this theory was that, within hours of swimming to shore and hailing police, Cummins supposedly "confessed" that he – alone – was responsible for the deaths of his cousins on the bridge that night.

The two audiotaped statements that Cummins gave to the police within hours of the incident, however, contain no hint of this "confession." Instead, the Master concluded that – among all those who testified about the events on the bridge on April 5, 1991 – Cummins was the "most honest man in this forest of deceit." Report at 91. These two lengthy taped (and transcribed) statements, like Cummins' trial testimony, "gave an account that was internally consistent in all major details through several iterations and which was borne out by the independent testimony of Daniel Winfrey, who was hardly his friend." Report at 91. In contrast, not only was Cummins' supposed "confession" not recorded, but Cummins also has consistently and vehemently denied that he ever made any such inculpatory statements.

---

[3]  The only other claim in the 2009 Petition is a claim that Clemons' death sentences are not proportional in light of the fact that his accomplice Antonio Richardson's death sentences were commuted. Clemons previously raised this claim in this Court, and the Court rejected it on the merits. *See Clemons v. Roper*, Case No. SC89534 (Mo. banc 2008).

Having built his defense on the theory that Cummins was the "real" killer, it is not obvious how Clemons' "new evidence" (which he claims proves that Cummins' supposed "confession" resulted solely from police abuse) constitutes clear and convincing proof  that Clemons did not rape and murder Julie and Robin Kerry. Presumably, Clemons is not arguing that statements made under such duress are more reliable than statements freely made.  In any event, the Master, demonstrating a commanding knowledge of the record, made short work of Clemons' freestanding claim of actual innocence:

> Of course, if newly discovered evidence would make it more likely than not that no reasonable juror would have convicted Clemons because Cummins was the perpetrator, that dog might hunt, but the truth is, it will not.  ***The time has finally come to drive a stake through the heart of the shibboleth that Thomas Cummins is the murderer responsible for the deaths of the Kerry sisters***.

Report at 87 (emphasis added).

As the Master explained, it was the flashlight Clemons left behind on the bridge that led police to question, in turn, Richardson, Clemons, Gray, and Winfrey.  Despite the evolving and self-serving nature of their statements, they collectively corroborated Cummins' initial recorded statements and erased any possibility that Cummins was the killer.  Report at 88.  The Master reasoned that, if Cummins was the killer and Clemons *et al.* were uninvolved, there is no way to explain: (1) why Cummins' watch would end up in Gray's possession; (2) why DNA evidence would "show[] conclusively that Gray had sex with at least one of the Kerry sisters" before she fell to her death from the bridge; (3) why Winfrey would plead guilty to two counts of murder and two counts of rape he

11

did not commit; (4) why Richardson's lawyer would concede to the jury (with no objection from his client, then or ever) that Richardson "should go away to prison for a very long time" for what he did on the bridge that night; and (5) why Clemons, even at this late date, would still refuse to answer questions under oath about his role in the rapes and murders of Julie and Robin Kerry. Report at 88-90.

The Master patiently explained to Clemons that, because a claim for habeas relief is a civil case, Clemons had no Fifth Amendment right to refuse to answer the questions put to him during the hearing before the Master. As a result, the Master explained to Clemons that, if Clemons persisted in answering some questions and refusing to answer others, the Master would treat Clemons' refusal to answer as if he had answered in a manner damaging to his claims. Clemons acknowledged that he understood these consequences but, nevertheless, refused to answer the following questions:[4]

- Whether Clemons and Gray initially restrained Cummins while Winfrey and Richardson grabbed Julie and Robin Kerry.
- Whether Clemons told Cummins, "Don't move or you'll get shot."
- Whether one of the girls urged the other not to fight as Clemons, Richardson and Gray were raping them.

---

[4]  After the Master gave this warning, Clemons (and his lawyers) reconsidered his refusal to answer the following three questions and, instead, answered each of them: "No."

> Q: And then you and Tony [Richardson] made those three people – Tom [Cummins]. Robin and Julie – get down one level lower, down on the bridge supports, didn't you?

> Q: Isn't it true that you stood on that platform by the manhole and you blocked their escape so there was nowhere that they could go?

> Q:  Those girls couldn't escape because you were blocking their way, weren't you?

As to the remaining questions, Clemons refused to answer and the Master drew the negative inference he warned Clemons he would draw. Clemons did not object to this inference then, and he does not object to it now.

- Whether Clemons raped both girls.

- Whether, when they had finished raping the girls, Gray left the bridge.

- Whether Clemons heard Richardson say they had to get rid of the girls so they wouldn't leave any witnesses and go to jail, and did not respond.

- Whether Clemons watched Richardson put the first girl down the manhole.

- Whether Clemons put the second girl down the manhole.

- Whether Clemons put Cummins down the manhole.

- Whether, once the three victims were on the platform below the bridge deck with Richardson, Clemons told Winfrey to find Gray and bring him back.

- Whether Clemons joined Richardson and the three victims on the platform.

- Whether Clemons saw Julie and Robin being pushed from the bridge pier into the river.

- Whether Clemons heard Cummins being told to jump or he was going to get shot.

- Whether Clemons and Richardson then ran back to the Missouri side of the bridge, where they met Gray and Winfrey coming back onto the bridge.

- Whether Clemons told Gray and Winfrey, "Let's go. We threw them off."

- Whether, referring to the three victims, Clemons later told Richardson, Gray, and Winfrey: "They'll never make it to shore."

Report at 90-91 (citing Master's Hearing at pp. 383-88).

The Master's Report concludes: "I infer from his refusal to answer those questions that, if he were truthful, Clemons' answers to *every one of those questions* would have been damaging to him." Report at 91 (emphasis added). No claim of innocence can survive such admissions.

### B. Clemons' "New Evidence" Is Not New

The Master also pointed out that Clemons' new evidence regarding Cummins' 1993 lawsuit and 1995 settlement is not "new" in any sense of the word. Report at 92-93.

13

To the contrary, Clemons filed copies of newspaper stories that described the suit and the settlement in 1995 in his state post conviction proceedings. Report at 93.

Not only did Clemons have knowledge of all of this so-called "new evidence" in 1995, the Master noted that Clemons had access to Cummins' allegations of coercion (and the possibility that he would file suit against the City) long before Clemons' trial. All Clemons' counsel needed to do to acquire this information was depose Cummins and ask him. Report at 92-93. Because the facts underlying Clemons' "new evidence" were in his possession since at least 1995, and because those same facts were reasonably available to Clemons even before his trial, the Master concluded Clemons had no excuse for waiting 14 years before claiming this evidence proved his innocence. Report at 93-94. "Evidence is 'new' only if it was 'not available at trial and could not have been discovered earlier through the exercise of due diligence.'" Report at 96 (quoting *State ex rel. Nixon v. Sheffield*, 272 S.W.3d 277, 284-285 (Mo. App. 2008)).

### C. Clemons' Newest "New Evidence" Is Not New Either

Clemons also argues that two additional pieces of "new evidence" – nowhere mentioned in the 2009 Petition – also constitute clear and convincing proof of innocence. First, Clemons relies on a 2012 deposition in which Cummins testifies that one of the four attackers said he wanted to let Cummins live, but that Cummins did not know which of the men made this comment. When Clemons' counsel pressed Cummins to admit that it could have been Clemons who made the statement, Cummins admitted that was possible. As a result, Clemons claims this is "new evidence" that proves he is innocent. The Master appropriately assessed this argument as "silly." Report at 96.

14

Cummins' 2012 testimony on this issue is the same as his audiotaped statements to the police within hours of the murders. Transcripts of these taped statements were admitted into evidence in Clemons' trial, and Cummins even testified on this subject. That Cummins gave substantially the same answer in a deposition 21 years after trial does not make this information "new evidence." Cummins was readily available prior to trial and, through the exercise of reasonable diligence, Clemons' counsel could have explored his recollection about this statement then. Accordingly, the Master concluded that Clemons cannot now rely on this information as "new evidence" of actual innocence.

Finally, Clemons contends that he has dramatic new evidence of actual innocence from a previously untapped source: himself. Because Clemons now claims that he did not kill Julie and Robin Kerry, and that he did not know about any explicit plan to kill them, he insists this is "new evidence" that constitutes clear and convincing proof of his innocence. As above, the Master rejected this argument because – even though Clemons' protestations of innocence are new – the information contained in his statements is not. Clemons has always known what role he did (or did not) play in the murders of Julie and Robin Kerry. Accordingly, the Master properly concluded that Clemons cannot assert his Fifth Amendment right not to testify at trial, wait 20 years, and then profess his innocence (albeit while refusing to answer questions about the incident) in order to claim that his last-minute denials are "new evidence." The Report concludes: "Clemons certainly had a 'previous opportunity to litigate' the claim that his own testimony would exonerate him: It was called a trial." Report at 97 (quoting *State ex. rel. Nixon v. Jaynes*, 63 S.W.3d 210, 214 (Mo. banc 2001)).

15

## III. *Gateway Claims of Constitutional Violations*

The Court appointed the Master to hold a hearing on the freestanding claim of actual innocence asserted in Clemons' 2009 Petition. The Master rejected this claim so thoroughly that Clemons now makes only passing reference to it. But Clemons did not stop there. Even though he did not allege any new constitutional claims in the 2009 Petition[5] – let alone allege facts sufficient to satisfy one of the two "gateways" for such claims – Clemons argued three new constitutional claims that he insisted were grounds to set him free. The Master analyzed each of these unpleaded claims, beginning with whether Clemons could satisfy one of the two "gateways" allowing him to raise any new claim at this late date.

As explained above, the first gateway permitting an inmate to raise a previously waived constitutional claim is proof that the inmate is "more likely than not" actually

---

[5]  Like a writ of certiorari, a writ of habeas corpus is a means of review, not a remedy. Under this Court's rules, the petition for writ of habeas corpus is an introductory pleading in which the inmate must "set forth facts that would establish the illegality of his confinement[.]" *Jaynes*, 63 S.W.3d at 217. If the petitioner fails to do so, the petition is to be denied without a hearing or review of the original trial record. *Id.* But if the petitioner makes a prima facie case that his confinement is illegal, the writ (or a show cause order) will issue to initiate review. The respondent then is required to file a return alleging facts proving that the petitioner's confinement is legal. The petitioner then files a traverse in which he admits or denies the facts pled in the return. Then, but only then, are the pleadings "joined." *Abel v. Wyrick*, 574 S.W.2d 411, 415 n.1 (Mo. banc 1978) ("in habeas corpus the issues are framed by the return and the traverse by way of reply"). If material facts are disputed, a master can be appointed to take evidence and make recommendations. If not, the Court will order briefing and decide the case.

Here, Clemons filed a petition and, before the respondent could offer suggestions as to why the petition was insufficient on its face, the Master was appointed to "take evidence on the issues joined." But, with no pleadings, there were no "issues joined." The touchstone for controlling the scope of discovery – to say nothing of a hearing – is the scope of the factual questions raised by the pleadings. The state appears not to have objected to the lack of pleadings, or to the lack of any motions to amend Clemons' pleadings, or to the ever-widening scope of Clemons' discovery and arguments.

16

innocent. The Master found Clemons could not use that gateway. Not only do Clemons' claims of innocence fail to meet the "clear and convincing" standard for a standalone claim under *Amrine*, the Master also rejected the claim that Clemons' innocence was "more likely than not." Instead, the Master concluded: "I do not believe Clemons has established a gateway claim of actual innocence." Report at 97.

To satisfy the one remaining gateway, Clemons must prove: (a) sufficient "cause" to justify why he did not – and could not – have raised the claim earlier; and (b) sufficient "prejudice" to show that the alleged constitutional violation actually affected the outcome of his trial. *Murray*, 477 U.S. at 488; *State ex rel. Woodworth v. Denney*, 396 S.W.3d 330, 337 (Mo. banc 2013). Before evaluating whether Clemons can establish the elements of this "cause and prejudice" gateway, it is important to note how they relate to the elements of the constitutional claim Clemons is trying to raise.

Clemons argues that the state failed to disclose three items of evidence that he believes would have been helpful to him at trial. Under *Brady*, it is a violation of due process requiring a new trial when: (1) the state ***fails to disclose*** exculpatory evidence relevant "to guilt or to punishment," *Brady*, 373 U.S. at 87, or impeachment evidence undermining credibility when "the reliability of a given witness may well be determinative of guilt or innocence," *Giglio v. United States*, 405 U.S. 150, 154 (1972); ***and*** (2) the undisclosed evidence is ***material***, i.e., there is a reasonable probability that –

17

if the evidence had been disclosed – the jury's verdicts would have been different.[6]

*United States v. Bagley*, 473 U.S. 667, 682, 685 (1985).

At first glance, the elements of the "cause and prejudice" gateway seem to be identical to the *Brady* elements of "nondisclosure" and "materiality." Certainly this is true with respect to "prejudice" and "materiality," and any evidence sufficient to meet one of these elements will be sufficient to meet the other. *Banks v. Dretke*, 540 U.S. 668, 691 (2004) ("prejudice within the compass of the 'cause and prejudice' requirement exists when the suppressed evidence is 'material' for *Brad*y purposes"). As the Master pointed out, however, proof of "nondisclosure" of exculpatory or impeachment evidence does ***not necessarily*** constitute proof of sufficient "cause" to excuse an inmate's failure to assert a particular *Brady* claim earlier. Report at 98. Accordingly, each of these elements is examined below in the context of Clemons' new *Brady* claims.

### A.  Draft Police Report – the (Truly) Final Refrain of "Cummins Did It"

Clemons' first *Brady* argument is based on the state's failure to disclose a draft of a police incident report of the events on the Chain of Rocks Bridge. This draft report, Clemons asserts, proves that it was Cummins – not Clemons *et al.* – who killed Julie and Robin Kerry. As recounted above, the Master's Report explains that no matter how many different times or how many different ways Clemons relies on the "Cummins did it" theory, that pooch simply will not hunt. Report at 87. Accordingly, even if Clemons had

---

[6]  The two elements of a *Brady* violation (i.e., "nondisclosure" and "materiality") are sometimes referred to as three elements by breaking "nondisclosure" into two elements. *See Strickler*, 527 U.S. at 281-82 (*Brady* requires: (1) "nondisclosure;" (2) of evidence that is "favorable to the accused, either because it is exculpatory, or because it is impeaching[;]" and (3) "materiality").

18

known of the draft police report prior to trial, he cannot show a reasonable probability that the "Cummins did it" theory ever would have convinced the jury not to convict him or not to recommend the death penalty.

But the Master did not dispose of this first *Brady* claim for lack of "prejudice" or "materiality." Instead, the Master noted that Clemons has no one to blame but his own lawyers for not having the draft police report before trial. With reasonable diligence, defense counsel could have obtained this report. Therefore, the Master concluded Clemons failed to establish either "nondisclosure" under *Brady* or "cause" under *Murray*.

> The rule in *Brady* is limited to discovery, after trial, of information which had been known to the prosecution, but unknown to the defense, *Nassar v. Lissel*, 792 F.2d 119, 121 (8th Cir. 1986). Thus, **evidence is not suppressed for Brady purposes "if the defendant had access to the evidence prior to trial by the exercise of reasonable diligence**," *U.S. v. Stuart*, 150 F.3d 935, 937 (8th Cir. 1998). "If the defendant had knowledge of the evidence at the time of trial, the State cannot be faulted for nondisclosure." *State v. Salter*, 250 S.W.3d 705, 714 (Mo. banc 2008). Moreover, to get this Court to undertake habeas review of Clemons' claim, he must "establish that the **grounds relied on were not 'known to him' during his direct appeal or post-conviction case**." *State ex rel. Engel v. Dormire*, 304 S.W.3d 120, 126 (Mo. banc 2010). I do not believe the evidence presented to me established a *Brady* violation simply because the State refused to produce a record whose existence was **fully known** to Clemons.

Report at 98 (emphasis added).

Accordingly, because Clemons' defense counsel had sufficient information to know the document existed, and because counsel could have obtained the report before trial through the exercise of reasonable diligence, the Report properly concludes that Clemons' first *Brady* claim must be rejected.

### B. Rape Kit

Clemons' second *Brady* claim consists of his contention that the state failed to disclose a "rape kit" taken during the autopsy of Julie Kerry's body. Because the "rape kit" shows there was no seminal fluid found in or on Julie's body at the time of her autopsy, Clemons insists his convictions must be set aside. He insists that, because this evidence was relevant both to his guilt and his punishment, there is a reasonable probability Clemons would not have been convicted and sentenced to death if it had been disclosed. The Master properly rejected this claim.

Clemons' argument ignores the fact that Julie's body was not recovered from the Mississippi River until three weeks after her murder. This accounts for the lack of any semen in or on the body at the time of the autopsy. Report at 98. Clemons' argument also ignores the evidence that Clemons was seen distributing condoms before the attack, and that a condom recovered from the scene showed a definite match to Gray's DNA. Report at 89.

The state has no duty under *Brady* or due process "to share all useful information with the defendant." *United States v. Ruiz*, 536 U.S. 622, 629 (2002). Instead, *Brady* applies only to evidence that is exculpatory evidence (i.e., relevant "to guilt or punishment," *Brady*, 373 U.S. at 87) or impeachment evidence (i.e., "affecting credibility" when the "reliability of a given witness may well be determinative of guilt or innocence," *Giglio*, 405 U.S. at 154). Here, the Master concluded "Clemons does not show that there is even a remote possibility that a rape kit performed under the circumstances existing in this case could reasonably be expected to show ***anything***."

20

Report at 98 (emphasis added). "[E]ven if there had been semen in the vagina at one time, after three weeks in the river, it would not be present." Report at 99. Accordingly, even though there is no doubt that Clemons proved "cause" because Clemons did not know (and could not have known) of the "rape kit" any earlier, the Master concluded Clemons failed to prove "nondisclosure" under *Brady* because the "rape kit" did not qualify as exculpatory evidence or impeachment evidence.

Whether evidence qualifies as exculpatory (*Brady*) or impeachment (*Giglio*) deals exclusively with the nature of the evidence. Once the undisclosed evidence qualifies under *Brady* or *Giglio*, the relative weight or probable impact of the evidence on the jury's verdicts is addressed under the "materiality" element. Of course, evidence that is not exculpatory and that does not tend to impeach a key witness cannot – logically – be material under *Brady*. Therefore, the Master also properly concluded that Clemons' "rape kit" claim must fail because there was no reasonable probability "that disclosure of the rape kit would have caused the result of the trial to be different." Report at 99.

### C. Probation Officer Warren Weeks

At 10:13 p.m. on April 7, 1991, Clemons finished giving his audiotaped statement to detectives in which Clemons: (a) admits raping Julie and Robin Kerry but (b) denies pushing (or helping anyone else push) them to their deaths. Though Clemons was under arrest at that time, the detectives continued to hold him in an interrogation room in the homicide division in the 7th Street headquarters. At 2:15 a.m. on April 8, Detective Pappas escorted Clemons to the men's "holdover" facility in the same building. There, Clemons was booked and, at 2:40 a.m., he was photographed and fingerprinted.

21

At 5:42 a.m., Clemons was interviewed by Commissioner Yvonne Edwards of the St. Louis Pre-Trial Release ("PTR") office. This interview was part of the process to see which new arrestees are eligible to be released on a pre-set bond (or their own recognizance) without an initial court appearance. When detectives from Internal Affairs investigated Clemons' later allegation that the detectives had assaulted him prior to his taped statement, Commissioner Edwards told them that she recalled her interview with Clemons. She said that Clemons had no apparent injuries to his face or elsewhere at that time and that he said nothing to suggest that he had been assaulted by anyone.

At 5:25 a.m., however, just minutes before this interview with Commissioner Edwards, Clemons was "pre-interviewed" by Warren Weeks. Weeks was a Probation and Parole officer assigned to the PTR office as a bond investigator. The purpose of Weeks' pre-interview was to question Clemons and, using his answers, fill out Clemons' Pre-Trial Release report. This report would then be checked and completed by Commissioner Edwards.

Weeks characterized Clemons as "not reluctant" and testified that he was "as talkative as other prisoners." Using Clemons' answers, Weeks filled out the portions of Clemons' PTR report that dealt with his residence, family, friends, employment and education. When he reached the third page of the form, Weeks asked Clemons about his physical condition. Weeks checked the box on the form marked "No Problems" because that is what Clemons told him. On the blank lines below this "No Problems" box, however, Weeks wrote the words "Asthmatic – Medications" because Clemons said that he had asthma that required medication.

22

Eighteen years later, at his deposition in October 2012, Weeks testified that – even though Clemons said he had "no problems" – Weeks remembered seeing a large swelling on Clemons' right cheek that was "between the size of a golf ball and a baseball." Weeks admits he did not think that Clemons had been hit.[7] When Weeks remarked to Clemons about the swelling, Clemons – who appears to have responded to everything else – did not respond or otherwise confirm Weeks' impression. In sum, Weeks concedes that he did not ask Clemons what caused the apparent swelling and admits that Clemons did not say – or even suggest – that he had been beaten by detectives at any time or for any reason.

Despite Clemons' failure to mention any injury to his cheek when Weeks asked about his physical condition and, more importantly, despite Clemons' failure even to acknowledge Weeks' comment about a swelling on the side of his face, Weeks testified in 2012 that he felt compelled to make a note about this swelling on Clemons' PTR report. But Weeks did not use the portion of the form devoted to Clemons' physical condition to give a complete description of the location, extent, or apparent age of the swelling. Nor did Weeks note that the swelling was "between the size of a golf ball and a baseball." Instead, Weeks testified in 2012 that he simply wrote the word "bruise" on Clemons' PTR report, or maybe it was "bump;" Weeks does not remember.

The word "bump" may have been written just below Weeks' note concerning Clemons' asthma, but the word has been crossed out and is illegible. Weeks testified that

_____

[7]  Weeks testified that he thought the swelling on Clemons' cheek might have been caused "by a spider bite."

he did not cross out the word on the morning of April 8, 1991, which is the last time he saw the form (or Clemons). But Weeks also admits that he does not know who did cross the word out or, more importantly, when this was done.

In 1991, Weeks' supervisor asked Weeks about what he had seen on Clemons' face and questioned whether there was anything for Weeks to see. The prosecutor also met with Weeks and showed him pictures of Clemons taken shortly before and after Weeks' interview with him. Weeks concedes those photos showed no injury, let alone a swelling between the size of a golf ball and a baseball, but neither the photographs nor the fact that Commissioner Edwards observed no swelling or other injury to Clemons' cheek just seconds after Weeks left him had any effect on Weeks or his story.

Weeks admits that the prosecutor did not try to make him change his story or keep the matter secret. Free to tell anyone what he remembered, Weeks never contacted Clemons' counsel, and they never contacted him. Clemons, of course, knows best who he met with in the hours and days following the interrogation, particularly those who volunteered remarks about an apparent injury to Clemons' face. Yet defense counsel made no effort to depose Weeks prior to Clemons' suppression hearing and trial, even though the state disclosed him as a potential witness and disclosed that he had been working at PTR in the early morning of April 8 when Clemons was booked. Like Clemons' trial counsel, Clemons' subsequent lawyers never questioned Weeks at any time during Clemons' lengthy state and federal post conviction proceedings. It was not until 2012, when Weeks reached out to the defense after hearing about the Master's

24

proceedings at his home in Texas, that Clemons' counsel questioned Weeks about what he remembers seeing more than 20 years earlier.

Because Clemons did not plead this claim in his 2009 Petition (or anywhere else), he has never had to specify precisely what it is about Weeks that the state failed to disclose. Clemons knows who he met with during the early morning hours of April 8 and certainly should remember the only person who supposedly volunteered a remark about the swelling on Clemons' cheek. Of course, Clemons might not remember that person's name. But the ***state disclosed Weeks' name and the fact that we was working at 7th Street PTR*** in September 1992, long before Clemons' trial. Legal File, at p. 505. This leaves only Clemons' PTR report, which Weeks prepared. But the ***state also disclosed Clemons' PTR report*** in February 1992, more than a year before Clemons' trial. *See* Clemons' Criminal Trial Legal File, at p. 506.[8] Accordingly, the state produced all it had, and Clemons had all he needed to ask Weeks about what Weeks thought he saw on Clemons' face.

Clemons ignores the state's disclosure of the PTR report, Weeks' name, Weeks' job, and the fact that Weeks' was working in PTR early on April 8, 1991. Instead,

---

[8]    There is no question that Clemons had the PTR Report more than a year before his trial. Clemons' counsel had the disclosure correspondence (found at page 506 of the original Legal File) marked as Exhibit 13 for the Master's hearing, and the Bates stamp on this document shows that it was produced from the files of Clemons' original trial counsel. In addition, both Clemons' interview with Weeks and Clemons' PTR report are mentioned in, and attached to, the report from Sergeant Huelsman of the Internal Affairs Division, which found Clemons' allegations of abuse to be unsubstantiated. The copy of the PTR report that was admitted at the Master's hearing has a Bates number that identifies it as having been produced by "IAD" as an attachment to that report, which the Master included as Exhibit 1 to his Report. Clemons has known about the IAD's report since August 1991, and the state disclosed the IAD's report to him no later than September 1992. Accordingly, there is no doubt that Clemons had the PTR report and knew who Weeks was (and why he was important) long before trial.

25

Clemons argues that the state failed to disclose Weeks' subjective impression concerning Clemons' appearance and physical condition that night. As with the "draft police report" discussed previously, however, this is information that Clemons had and/or could have obtained with reasonable diligence. Accordingly, Clemons cannot demonstrate sufficient "cause" for failing to assert this claim earlier and – even if he could – the state's failure to disclose this information was not a "nondisclosure" under *Brady*.

### 1. *"Nondisclosure" under* Brady

*Brady* does not apply to all evidence that might be "helpful" to the defense. Instead, it only applies to exculpatory evidence, i.e., "evidence [that] is material either to guilt or punishment." *Brady*, 373 U.S. at 87. *See also Merriweather v. State*, 294 S.W.3d 52, 54 (Mo. banc 2009) (*Brady* applies to "evidence [that] is material either to *guilt or punishment*") (emphasis added); *State ex rel. Engel v. Dormire*, 304 S.W.3d 120, 126 (Mo. banc 2010) (same). Later, *Brady* was extended to impeachment evidence. *Giglio*, 405 U.S. at 154. But *Giglio* does not extend *Brady* to all impeachment evidence, only "evidence affecting credibility" where the "reliability of a given witness may well be determinative of guilt or innocence." *Giglio*, 405 U.S. at 154.

The first question, therefore, is whether Weeks' subjective impression of Clemons' condition is exculpatory evidence. The Master did not find that it was, and this plainly is correct. There is no logical or legal connection between Weeks' subjective impression of Clemons' appearance at 5:25 a.m. on April 8 and the role that Clemons did (or did not) play in the deaths of Julie and Robin Kerry on the Chain of Rocks Bridge in the early morning hours of April 5.

26

Second, the Master did not find that Weeks' evidence would have impeached Cummins or Winfrey, the only two witnesses at trial whose testimony clearly was "determinative of guilt or innocence." *Id.* Nor did the Master find that Weeks' evidence would have impeached the testimony of the two detectives who testified at the suppression hearing and denied that they (or anyone else) abused Clemons at any time. This, too, is correct because Weeks admits that he has no idea how or if Clemons was injured, let alone whether it resulted from the detectives beating him prior to 9:35 p.m. on April 7 (i.e., when Clemons claims the abuse ended) in an effort to coerce Clemons into making a statement.

Instead, the Master concluded that Weeks' subjective impression that Clemons' face looked swollen was impeachment evidence – not for the detectives – but for ancillary witnesses (e.g., Sergeant Williams) who testified that Clemons' cheek was not swollen in the hours and days after he gave the audiotaped statement. The Master is correct. It was the state's burden at the suppression hearing to show that Clemons' statement was voluntary, not Clemons' burden to show it was involuntary. The detectives' testimony, if believed, is sufficient for the state to carry its burden.

Unlike the detectives' testimony, testimony from Sergeant Williams (and others) that Clemons appeared uninjured in the hours and days after he gave his statement ***does not*** prove the statement was voluntary, even if believed. Instead, this evidence makes the detectives' testimony more believable because it corroborates their testimony. By the same token, evidence from Weeks (and others) that Clemons' face was swollen in the hours and days after Clemons made his statement ***does not*** prove that the statement was

27

involuntary.  Instead, it only casts doubt on the evidence from Sergeant Williams (and others) that corroborates the detectives' testimony.   Accordingly, the Master correctly concluded that "testimony by Weeks is a method of impeachment" to cast doubt on the credibility of Sergeant Williams.  Report at 103.

Just because Weeks' subjective impression of Clemons' appearance is properly characterized as impeachment evidence, however, does not necessarily mean it is covered by *Brady*.  As noted above, *Giglio* does not extend *Brady* to every piece of evidence that might impeach any witness on any issue.  Instead, *Giglio* extends *Brady* only to impeachment evidence when the "reliability of a given witness ***may well be determinative of guilt or innocence***."  *Giglio*, 405 U.S. at 154 (emphasis added).  *See also Engel*, 304 S.W.3d at 120 (undisclosed evidence would have impeached "chief prosecution witness").  Here, Sergeant Williams testified that he saw no swelling on Clemons' face on the afternoon of April 8.  He is not a witness "who may well be determinative of guilt or innocence," and neither were any of the other witnesses who saw no injury to Clemons' face in the hours and days after his interrogation during the evening of April 7.  Accordingly, Weeks' evidence is not impeachment evidence for purposes of *Brady*.

Suppression hearings protect important constitutional rights, usually under the Fourth, Fifth, and Sixth amendments.  But these proceedings do not determine guilt or innocence.  In fact, courts readily acknowledge that suppression often comes at the expense of determining these questions.  This is why federal courts have been skeptical as to whether *Brady* even applies to evidence in suppression hearings.

28

The information was relevant to impeaching the officers' explanation at the suppression hearing as to why they had probable cause to detain and arrest Ienco, ***but the Seventh Circuit has never squarely held that* Brady *applies to suppression hearings***. *See United States v. Stott,* 245 F.3d 890, 901–02 (7th Cir. 2001). And, although Ienco could have used the report to impeach the defendants' testimony regarding the arrest, such impeachment ***does not go to Ienco's guilt or innocence***, and thus does not fall within the parameters of *Brady. See Giglio,* 405 U.S. at 154, 92 S.Ct. 763 (noting that when the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within the *Brady* rule); *see also Bagley,* 473 U.S. at 677, 105 S.Ct. 3375. Ienco simply failed to satisfy *Brady's* materiality prong.

*Ienco v. Angarone*, 291 F. Supp. 2d 755, 762 (N.D. Ill. 2003) (emphasis added), *aff'd*,

429 F.3d 680 (7th Cir. 2005). Another district court provided this overview of the issue:

> ***Circuit courts have split*** on the issue whether *Brady v. Maryland's* restrictions apply to suppression hearings, ***although it is not likely that a prosecutor must disclose impeachment evidence before a suppression hearing in light of the Supreme Court's conclusion in United States v. Ruiz*** that a prosecutor does not have to disclose impeachment evidence before the entry of a guilty plea.
>
> * * *
>
> United States Court of Appeals for the District of Columbia has recognized that "it is hardly clear that the *Brady* line of Supreme Court cases applies to suppression hearings," because "***[s]uppression hearings do not determine a defendant's guilt or punishment, yet* Brady *rests on the idea that due process is violated when the withheld evidence is 'material either to guilt or to punishment.'"*** *United States v. Bowie,* 198 F.3d 905, 912 (D.C. Cir. 1999).

*United States v. Harmon*, 871 F. Supp. 2d 1125, 1151-52 (D.N.M. 2012), *aff'd,* 742 F.3d

451 (10th Cir. 2014) (emphasis added).

Even assuming that *Brady* extends to suppression hearings, however, or at least to

those suppression hearings in which the voluntariness of a defendant's inculpatory

statement is to be decided, *Brady* certainly does not extend ***further*** in a suppression

29

hearing than it does at trial. Accordingly, *Brady* should only extend to evidence that tends to prove the statement was involuntary (i.e., the suppression hearing equivalent of exculpatory evidence regarding guilt or punishment) or to evidence that tends to impeach the credibility of a witness who "might well be determinative" of the voluntariness issue (i.e., the suppression hearing equivalent of impeachment evidence regarding a witness whose credibility "might well be determinative" of guilt or innocence). Weeks' evidence does neither.

Weeks' subjective impression regarding Clemons' appearance hours after his interrogation ended does not prove that detectives physically abused Clemons to make him give a statement. Nor does it impeach the detectives' testimony in which they denied beating Clemons for that (or any other) purpose. Instead, the Master properly concluded that Weeks' evidence serves only to impeach those witnesses like Sergeant Williams whose testimony, in turn, corroborates the detectives' testimony. Accordingly, as with Clemons' claim regarding the rape kit, Weeks' evidence is not impeachment evidence for purposes of *Brady* and *Giglio*.

### 2. *Sufficient "Cause" to Bring a Belated* Brady *Claim*

Even if *Brady* applies to the state's failure to disclose evidence that merely impeaches the credibility of corroborating witnesses and not witnesses who might be determinative of whether Clemons' statement was voluntary or not, Clemons cannot raise a new *Brady* claim where the undisclosed evidence was known – or, through the reasonable diligence of defense counsel, could have been known – to him earlier. This is the "cause" element of the "cause and prejudice" gateway, and it requires "a showing that

the factual or legal basis for a claim was not reasonably available to counsel or that some interference by officials made compliance impracticable." *Murray*, 477 U.S. at 488 (quotation marks and citations omitted). *See also Woodworth*, 396 S.W.3d at 337 (same).

Just as the Master properly rejected Clemons' *Brady* claim regarding the draft police report on the ground that Clemons' counsel knew about the report and, with reasonable diligence, could have obtained it, Clemons' *Brady* claim regarding Weeks also should fail. Months before trial, Clemons knew who Weeks was, he knew that Weeks had thought Clemons' cheek was swollen at 5:25 a.m. on April 8, and he had in hand the PTR report that Weeks had prepared during that interview. Unfortunately, the Master never analyzed whether Clemons had shown sufficient "cause" to raise a new *Brady* claim regarding the Weeks' evidence.[9] If he had, he would have had to conclude, as he did with the draft police report, that Clemons cannot profit now from information that he knew about long before trial and that his lawyers could have pursued (but did not pursue) more than 20 years ago.

---

[9]   As noted previously, Clemons has been allowed to argue many claims that he failed to plead in his 2009 Petition, including the claim on which the principal opinion now grants relief. For most of these claims, Clemons' apparent exemption from the ordinary rules of pleading merely resulted in an extension of the Master's process and a certain degree of fuzziness in the precise contours of the arguments Clemons has advanced. On Clemons' *Brady* claim regarding Weeks, however, the cost of freeing Clemons from the rules of pleading is much greater. Not only is there no *Brady* claim regarding Weeks in the 2009 Petition, at no time in the years leading up to – and through – the Master's hearing did Clemons ever argue a *Brady* claim relating to Weeks. The Master noted at the end of the hearing that the record would be held open to allow Clemons' counsel time to depose Weeks but, even then, there was no suggestion that Weeks' information would constitute a separate *Brady* claim. The claim was so unforeseen that the state's proposed findings and conclusions make no mention of it – or Weeks – at all. More importantly, because this claim was never briefed before the Master, the treatment of this claim in the Report lacks the same orderly and detailed analysis given to every other claim on which the state (and the Master) had at least informal notice.

Clemons ignores that the state disclosed Weeks' name and the fact that he was doing PTR pre-interviews at 7th Street on the morning Clemons was booked. Instead, Clemons argues that the state failed to disclose that Clemons' PTR report had been "altered'" (i.e., that the word "bruise" had been crossed out). That argument is baseless.

Clemons' PTR report was produced to defense counsel in September 1992. If it had been altered **before** it was produced, defense counsel should have spotted the alteration and asked Clemons (and/or Weeks and/or Commissioner Edwards) about it then. On the other hand, if Clemons' PTR report was altered **after** it was disclosed to the defense, then the alteration is irrelevant because defense counsel's copy of the document shows whatever it is that Weeks wrote on the report. Either way, because Clemons had all the information about the altered PTR report that the state had, this is the very antithesis of a *Brady* violation.

Clemons' final argument is that the state failed to disclose Weeks' subjective impression that Clemons' face looked swollen on the morning of April 8, 1991. This claim is the most absurd of all. Clemons knows that Weeks thought his face looked swollen because Weeks **mentioned the apparent swelling to Clemons** when the two were sitting face-to-face that morning of April 8, 1991. Accordingly, Clemons knew about Weeks' subjective impression before anyone else (except Weeks, of course). *Brady* does not require the state to remind defendants of things other people told them. *See Sate v. Salter*, 250 S.W.3d 705, 714 (Mo. banc 2008) (under *Brady,* if "the **defendant had knowledge of the evidence at the time of trial**, the State cannot be faulted for

32

nondisclosure") (emphasis added) (citations omitted); *Kyles,* 514 U.S. at 437 (*Brady* applies only to evidence "***unknown to the defense***") (emphasis added).[10]

Even if Clemons did not remember the name of the PTR officer who remarked that Clemons' faced looked swollen on the morning of April 8, Clemons certainly knows that someone in the PTR office made a remark to that effect. The state's witness list disclosed that Weeks worked in that office, and the state also disclosed the sign-in sheet for 7th Street "holdover," which shows that Weeks was on duty when Clemons was booked. If Clemons wanted to prove that he appeared injured after his interrogation ended, interviewing those with whom Clemons had contact – and especially those who told Clemons that his face looked swollen – would have taken very little investigative insight and only slightly more effort.

Accordingly, Clemons failed to prove sufficient "cause" for failing to bring a *Brady* claim concerning Weeks much earlier, assuming such a claim ever could have been made. Clemons has always known that Weeks thought Clemons' cheek was

---

[10] *See also United States. v. Graham,* 484 F.3d 413, 417 (6th Cir. 2007) ("there is no *Brady* violation **if the defendant knew or should have known the essential facts** permitting him to take advantage of the information in question, ***or if the information was available to him from another source***") (emphasis added); *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000) (same); *United States v. Rodriguez,* 162 F.3d 135, 147 (1st Cir. 1998) ("The government has no *Brady* burden when the necessary facts for impeachment are ***readily available to a diligent defender***") (emphasis added); *United States v. LeRoy,* 687 F.2d 610, 618 (2nd Cir. 1982) ("Evidence is not 'suppressed' if the defendant **either knew, or should have known, of the essential facts** permitting him to take advantage of any exculpatory evidence") (emphasis added and citation omitted); *United States v. McKenzie,* 768 F.2d 602, 608 (5th Cir. 1985) ("*Brady* does not oblige the government to provide the defendants with evidence that they could obtain from other sources by exercising reasonable diligence").

swollen *because Weeks told Clemons that he thought Clemons' cheek looked swollen*.[11]

With the slightest effort – not to mention reasonable diligence – the defense could have identified Weeks as the person who made this remark, deposed him, and asked him both about Clemons' appearance and about what it is Weeks wrote on the PTR report that was later crossed out.   *See Coleman v. Mitchell,* 268 F.3d 417, 438 (6th Cir. 2001) ("'the *Brady* rule does not assist a defendant *who is aware of essential facts* that would allow him to take advantage of the exculpatory evidence at issue,' such as when the *evidence in question 'would have been discoverable with minimal investigation* by [defense] counsel.'") (emphasis added); *United States v. Jones*, 160 F.3d 473, 479-80 (8th Cir. 1998) ("no *Brady* violation if 'the defendant[s], *using reasonable diligence, could have obtained the information'* themselves") (quoting *Westley v. Johnson,* 83 F.3d 714, 726 (5th Cir. 1996)) (emphasis added).

### 3. Weeks' Evidence is NOT Material

Even if Clemons could show "cause," and even if Clemons could show there was a "nondisclosure" for purposes of *Brady* (i.e., that the undisclosed evidence was either

---

[11]   To be clear, the fact that Clemons has known about Weeks' subjective impression regarding Clemons' appearance since Weeks remarked to Clemons about it also means that there was no "nondisclosure" for purposes of establishing a *Brady* violation. As the Master's conclusions regarding the draft police report show, there is great overlap between "cause" and "nondisclosure." *See, e.g., Graham*, 484 F.3d at 417 (there is no *Brady* violation when defendant knew or should have known of the essential facts or the evidence was available from another source through reasonable diligence); *Coleman*, 268 F.3d at 438 (same). For present purposes, however, Clemons' knowledge and the state's complete disclosures are addressed under "cause" merely to keep that analysis distinct from the fact that – even if Weeks had not remarked to Clemons about Clemons' appearance, and even if the state had not disclosed Weeks' name and the PTR report – this is not the sort of exculpatory or impeachment evidence that comes under the reach of *Brady* and *Giglio*.

exculpatory on the issues of guilt or punishment or would impeach a witness whose testimony may be determinative of guilt or punishment), Clemons is not entitled to have his murder convictions and death sentences set aside because Weeks' evidence was not "material."  As the Supreme Court recently reaffirmed:

> evidence is "material" within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.  A reasonable probability does not mean that the defendant would more likely than not have received a different verdict with the evidence, only that the likelihood of a different result is great enough to undermine[ ] confidence in the outcome of the trial.

*Cain*, 132 S. Ct. at 630 (citations and quotation marks omitted).

"Materiality" for purposes of *Brady* is the same as the prejudice element for claims of ineffective assistance of counsel under *Strickland*, and both of these are the same as the "prejudice" prong of "cause and prejudice."  *Bagley*, 473 U.S. at 682.  Under any of these tests, the inmate must show that, but for the nondisclosure (or ineffective assistance of counsel), there is a reasonable probability that the inmate would not have been convicted or received the sentence he did.  *Id*. (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

As noted above, there is some doubt as to whether *Brady* even applies to evidence in a suppression hearing.  Federal courts are unanimous, however, in holding that – if *Brady* does apply to suppression hearings – the inmate must show **both**:  (1) a reasonable probability that the undisclosed evidence would have altered the outcome of the suppression hearing; **and** (2) a reasonable probability that the suppression of the evidence would have altered the outcome of the trial on the question of guilt or punishment.

35

> Had [the witness] testified, it seems highly ***unlikely that she would have affected the outcome of the suppression hearing, no less the trial***. To make a difference at the hearing, [her] testimony would have needed to overwhelm the State's countervailing evidence; otherwise, it would not have convinced the judge to suppress McNary's statements…. Further still, [the witness's] statements could not have affected the outcome of the trial. ***To establish prejudice, [the defendant] would need to show not only "a reasonable probability that he would have prevailed on the motion to suppress" but also "a reasonable probability that ... he would have been acquitted."*** *Bynum v. Lemmon,* 560 F.3d 678, 685 (7th Cir. 2009). Here, even if [the witness's] testimony convinced the judge to suppress [the defendant's] statements, the outcome of the trial would not have changed.

*McNary v. Lemke*, 708 F.3d 905, 916 - 917 (7th Cir. 2013) (emphasis added). *See also*

*Bynum v. Lemmon*, 560 F.3d 678, 685 (7th Cir. 2009) (inmate must "show that, had he testified, there was both a reasonable probability that he would have prevailed on the motion to suppress and a reasonable probability that, if his confessions were suppressed, he would have been acquitted").

No court, state or federal, has granted relief where – as the Master found – the undisclosed evidence might have altered the result of a suppression hearing alone. In every case, the inmate also must show a reasonable probability that, if the topic of the suppression hearing had been excluded at trial, the jury's verdicts would have been different. *Nuckols v. Gibson*, 233 F.3d 1261, 1267 (10th Cir. 2000) (relief granted where state failed to disclose evidence showing the "key" witness in suppression hearing may have "had a motive to goad [the inmate] into waiving his right to counsel during the interrogation and confessing to the crime and, if the inmate's confession had been suppressed, there is a reasonable probability he would not have been convicted and sentenced to death"); *White v. United States*, 352 F. Supp. 2d 684, 688 (E.D. Va. 2004)

36

("Petitioner cannot show that a suppression hearing would have resulted in the suppression of any evidence that would [have] affected the outcome of Petitioner's trial").

Even if the state had produced to Clemons what he already knew (i.e., that Weeks thought Clemons' face was swollen when they met on the morning of April 8, 1991), there is no reasonable probability that the trial judge would have suppressed Clemons' audiotaped statement. And, even if the trial judge had suppressed Clemons' statement, there is no reasonable probability that the jury's verdicts on Clemons' guilt and punishment would have been any different.

### (a) Weeks' Evidence Would Not Have Altered the Suppression Hearing

The Master did not find there was a reasonable probability that the disclosure of Weeks' evidence **would have resulted** in Clemons' audiotaped statement being suppressed. Instead, the Master found only that there was a reasonable probability that Weeks' evidence "might have resulted" in a different outcome for the suppression hearing. The difference is important because, while the latter finding is supported by the evidence, the former finding never would have been.

To assess what impact Weeks' evidence might have had on the suppression hearing, the Court must look at why the trial court overruled the motion to suppress and whether there is a reasonable probability that Weeks' evidence would have altered that decision. In overruling Clemons' motion to suppress, the trial court stated:

> The basis for my ruling is there was **not any credible evidence to show how [Clemons] got those injuries if, in fact, he got them**. And that was other

37

than the defendant's testimony. And I applied the same ruling that we tell our jurors to use when assessing the credibility of a witness, and that was the basis for my ruling.

Clemons' Trial Transcript at 1765.[12]

The trial court's reference to the general jury instruction on judging witness credibility is instructive. *See* MAI CR 302.01. This instruction tells jurors to take into consideration, among other things, the witness's manner while testifying, the reasonableness of the witness's testimony considered in light of all the evidence in the case, and whether the testimony may be influenced by the witness's interest, bias, or prejudice.

Here, Clemons' interest and bias is obvious. As to his "manner," Clemons' own trial counsel testified in the post conviction proceeding that Clemons' demeanor on the stand during the suppression hearing was a key factor in determining not to recommend

---

[12] On March 18, 1996, the motion court overruled Clemons' motion for post conviction relief based, in part, on the following factual finding:

> With respect to movant's injuries, the only credible evidence was that, after the homicide detectives questioned him and obtained his statements, [Clemons] was taken to prisoner processing for booking (approximately 2:00 a.m. on April 8, 1991). As part of the processing procedure movant was fingerprinted and photographed. Joyce Taylor, the clerk who booked movant, stated that movant had no injuries on or about his face when he was booked. It was not until Tuesday April 9, 1991, after spending over 24 hours in the holdover, that movant was observed to have the right side of his face swollen. (See Findings of Fact paragraph 24; counsel and/or movant's mother apparently confused admission to City Jail with 'booking' which took place at Police Department's Prisoner Processing section).

Order Denying PCR, at 42-43. The finding referred to states: "On cross-examination, [Clemons' trial counsel] said that there were no medical records which supported movant's contention that he had been struck ten to twenty times." *Id.* at 8. Although Clemons' mother told defense counsel "that the 'booking records' indicated injuries at the time of 'booking,'" *id.*, the motion court found that this was a reference to Clemons' intake at the city jail on the afternoon of April 9, not his booking at PPD that occurred nearly 36 hours earlier at 2:28 a.m. on April 8. *Id.* 42-43.

38

that he testify at trial. *See* Order Denying PCR, at 42-43. Finally, Clemons' testimony that the detectives beat him continuously was not reasonable in light of the fact that the trial court found no "credible evidence to show how he got [his] injuries if, in fact, he got them." In short, the trial court ***believed*** the detectives' testimony denying that they mistreated Clemons and ***did not believe*** Clemons' testimony that they beat him into making the audiotaped statement. Therefore, there is no reasonable probability that the disclosure of Weeks' evidence would have changed this ruling because the trial court made its decision on the basis of the officers' and Clemons' credibility, not on the strength (or weakness) of the corroborating witnesses such as Sergeant Williams.

The trial court overruled the motion to suppress based on the credibility and demeanor of Clemons and the two detectives; Weeks' evidence sheds no light on this. The trial court overruled the motion based on Clemons' obvious bias and motive to lie; Weeks' evidence sheds no light on this either. The only issue on which Weeks' evidence is relevant is whether the detectives' testimony was reasonable – and Clemons' was unreasonable – in light of the "other evidence." In order to assess – on the one hand – the corroborating witnesses whose testimony supports the detectives' testimony and – on the other hand – the witnesses whose testimony impeaches the corroborating witnesses' evidence, the following is a recap all of the evidence before the Master regarding who saw Clemons, when, and what they saw:

Sunday, April 7, 1999

> 9:35 p.m.          Clemons begins audiotaped statement to
> Detectives Pappas and Brauer in the
> Homicide Division

39

| | |
|---|---|
| 10:13 p.m. | Clemons' audiotaped statement ends |
| | Detectives Pappas and Brauer say they did not assault Clemons and that he was unharmed and unmarked when the interview ended |
| 10:15 p.m. | Clemons held in Homicide Division interrogation room until taken to men's "holdover" in Prisoner Processing Division ("PPD") |

Monday, April 8, 1991

| | |
|---|---|
| 2:15 a.m. | Detective Brauer delivered Clemons to men's holdover in PPD to await booking |
| 2:28 a.m. | PPD Processing Clerk Joyce Taylor prepared Clemons' arrest register |
| | Taylor saw no injuries to Clemons' face and did not hear Clemons complain about being injured or assaulted by anyone in PPD |
| | Watch Commander Darla Gray was present when Clemons was booked; she saw no injuries to Clemons' face, and Clemons did not complain about being injured or assaulted by anyone |
| 2:39 a.m. | Clemons returned to men's holdover |
| 2:40 a.m. | Clemons taken to Identification Unit, where Fingerprint Processor Phil Waller fingerprinted Clemmons and took the booking photos[13] showing no injury on his face |

---

[13]   These photos were marked as exhibits H, I, and J in the hearing before the Master and were marked as state's exhibits 106, 107 and 108, respectively, in Clemons' criminal trial. In the Master's hearing, Waller testified to having taken these photos at approximately 2:40 a.m. on April 8, 1991, and Clemons admitted that they were taken during his booking. Clemons' efforts to introduce doubt about these facts merely by saying he does not believe them is unavailing. There is no question that the booking photographs were taken at 2:40 a.m. on April 8, and the Internal Affairs photographs were taken on the afternoon of April 9.

| | |
|---|---|
| | Waller saw no injuries to Clemons' face, and Clemons did not complain about being injured or assaulted by anyone |
| 5:25 a.m. | Probation Officer Warren Weeks, assigned to the Pre-Trial Release Commissioner's Office (which uses space in the PPD), interviewed Clemons |
| | Weeks saw a swelling on Clemons' right cheek that was "between a golf ball and a baseball" in size |
| | Weeks asked Clemons about the swelling, but he did not respond |
| | Weeks did not hear Clemons complain about being injured or abused by anyone, and Clemons said he had "No Problems" when Weeks asked him about his physical condition |
| 5:42 a.m. | Pre-Trial Release Commissioner Yvonne Edwards interviewed Clemons |
| | Edwards saw no injuries to Clemons' face and did not hear Clemons complain about being injured or assaulted by anyone |
| 6:58 a.m. | Gray was delivered to men's holdover from the Homicide Division[14] |
| 2:10 p.m. | Detective Sergeant Warren Williams interviewed Clemons in men's holdover |
| | Sgt. Williams did not see any injuries to Clemons' face and did not hear Clemons complain that he had been injured or assaulted by anyone |
| 2:15 p.m. | Michael Kelly, Clemons' attorney, interviewed |

---

[14]   Except for short periods when Gray was being photographed, printed and interviewed in Pre-Trial Release (as Clemons had been), Clemons and Gray were together in the men's holdover from 6:58 a.m. on April 8 until 7:30 a.m. on April 9.  At that time, they were transported to the criminal courts building, where Clemons and Gray were together again in the holding pens between 8:00 a.m. and noon.

41

Clemons in men's holdover

Kelly noted the right side of Clemons' face was swollen, that he had an abrasion on that cheek, an abrasion on his lip, and bruises on his chest

Afternoon
Pre-Trial Commissioner Victor Kelly met with Clemons (and Gray) to tell them they were not eligible for automatic bond or release

Commissioner Kelly saw no injuries on either prisoner's face and heard neither Clemons nor Gray complain about being injured or assaulted by anyone

5:35 p.m.
Watch Commander Sergeant Steven Mueller conducted a cell inspection in men's holdover

Though Mueller had no reason to note Clemons (or Gray) specifically, he observed no injuries to any prisoner and received no complaints from any prisoner about being injured or assaulted by anyone

7 to 8 p.m.
Veronda Brown, Clemons' sister, noted that the right side of Clemons' face was "lopsided" and swollen

Brown heard Clemons say he had been "beaten," but he did not say who had beaten him or why, and Clemons did not claim police detectives had beaten him to make him give a statement

Tuesday, April 9, 1991

7:30 a.m.
Deputy Sheriff John Tyra transported Clemons and Gray from men's holdover to the criminal courts building for appearance

8:00 a.m. to noon
In the holding pens at the criminal courts building, prisoner Michael Kent saw (but did not speak to) Clemons

Kent observed that Clemons' lip was swollen but did not observe any swelling to Clemons' cheek or eye and

42

|  |  |
|---|---|
|  | did not hear Clemons complain about being injured or assaulted by anyone |
| Morning | Vera Thomas, Clemons' mother, saw Clemons at his court appearance and observed that Clemons' jaw was swollen and "sticking out" |
| Morning | Reynold Thomas, Clemons' stepfather, saw Clemons at his court appearance and observed Clemons' right cheek was swollen |
| Morning | Donald Robinson, Clemons' cousin, saw Clemons at his court appearance and observed Clemons' right eye was "swollen shut" |
| Morning | Michael Kelly, Clemons' attorney, saw Clemons at his court appearance and observed that Clemons' injuries were not as evident as they had been the previous afternoon, but noted Clemons' right cheek was still "slightly swollen" |
| Noon | Deputy Sheriff John Tyra transported Clemons and Gray to the City Jail |
| Afternoon | While being processed into the city jail, Clemons told Lorenzo Chancelor, correctional counselor, that his (Clemons') right cheek was swollen

Chancelor noted this on Clemons' intake forms, which he testified he would not have done had he not seen it |
| 1:30 p.m. | Julian Boyd, Superintendent of the St. Louis City Jail, notified St. Louis Police Department Internal Affairs that Clemons and Gray wanted to file complaints of physical abuse by police detectives |
| After 1:30 p.m. | Internal Affairs Sergeants Huelsmann and Swiderski interviewed Clemons briefly at the city jail

Neither Internal Affairs officer saw any visible signs of injury to Clemons' face |

Even though Clemons complained of a "cut" inside his mouth, Huelsmann and Swiderski could find nothing but a small hole (1/16th of an inch) on the inside of Clemons' lower lip

Clemons was again photographed[15] to document his condition at this time

7:50 p.m.      Dr. Duntley, an emergency room physician, examined Clemons at Regional Medical Center[16]

Duntley saw evidence of "mild facial trauma" (i.e., "mild swelling" on the right cheek), which Duntley characterized as "not impressive"

Duntley opined that Clemons' injuries might have been caused by a blow or other contact with a hard surface and could have been self-inflicted

Duntley found no swelling around Clemons' eye and testified it certainly was not "swollen shut"

Duntley found no significant injury to Clemons' lip and concluded, if there had been a laceration at all, it must have been "minute"

Clemons did not complain to Duntley of any pain or tenderness in his chest or scalp, and Duntley opined that anyone who had been struck there repeatedly

---

[15] These photos were marked as exhibits K and L in the hearing before the Master and were marked as state's exhibits 109 and 111, respectively, in Clemons' criminal trial. Clemons admitted they were taken by Internal Affairs on April 9, and they were described and attached to the Internal Affairs report rejecting Clemons' (and Gray's) claims of physical abuse as "unfounded" and "not sustained."

[16] There is no clear explanation of how or why Clemons was seen at Regional on the evening of April 9, 1991. According to Clemons' mother, Judge David ordered him to be examined during his arraignment that morning. Report at 68. Assuming that is what happened, the Master pointed out that there is "no evidence in the record that Judge David made an independent determination that Clemons was hurt." *Id.* Instead, Clemons' counsel admitted during his testimony in Clemons' Rule 29.15 proceedings that "Judge David told him that he did not see too much to complain about, but when anybody says he is hurt, Judge David said, I automatically make sure they get to the infirmary." *Id.*

within the preceding 10 to 15 hours would be tender and bruised if the blows were even "moderately hard"

Duntley testified that he saw no swelling or any significant bruising on the right side of Clemons' face in the booking photographs from 2:40 a.m. on April 8 or the photographs taken by Sgts. Huelsmann and Swiderski on the afternoon of April 9

As the Master noted, the state's burden in a suppression hearing is relatively low, i.e., the state need only show that it is more likely than not that the statement was voluntary. It is conceivable that, in a suppression hearing stand-off between police and a defendant, evidence that would impeach the evidence that corroborates the police's version could be "material" for *Brady* purposes. But not here. Just as Kelly's evidence that Clemons' face was swollen is offset by Williams (who saw Clemons immediately before Kelly), Weeks' evidence that Clemons' face was swollen is offset by Edwards (who saw Clemons immediately after Weeks).[17] Standing alone in this mass of conflicting recollections are the photographs of Clemons taken at 2:40 a.m. on April 8 and on the afternoon of April 9, none of which show any sign of the golf ball-sized or baseball-sized swelling described by Weeks or the entirely different (but equally gruesome) injuries described later by Kelly and Clemons' family. Ultimately, just as it did 20 years ago, the issue comes down to credibility.

---

[17] This is the analysis used in *Barton v. State*, 432 S.W.3d 741, 761 (Mo. banc 2014), in which this Court held that impeachment evidence was not material for *Brady* purposes when there was evidence that corroborated the testimony of the state's witnesses because such corroborative evidence "serves to minimize any damage that might have been done to [the witness's] credibility by the introduction" of the undisclosed evidence. *See also Wilson v. Whitley*, 28 F.3d 433, 439 (5th Cir. 1994) ("when the testimony of the witness who might have been impeached by the undisclosed evidence is strongly corroborated by additional evidence supporting a guilty verdict, the undisclosed evidence generally is not found to be material").

45

Accordingly, if the trial court had heard Weeks' evidence in the context of all the evidence as set forth above, it cannot be said there is a reasonable probability that Weeks' evidence "***would have resulted***" in the trial court suppressing Clemons' statement. *United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004) ("when the testimony of the witness who might have been impeached by the undisclosed evidence is strongly corroborated by additional evidence supporting a guilty verdict, the undisclosed evidence generally is not found to be material").

Even on the first step of the materiality analysis, Clemons does not have to prove that the trial court would have overruled the motion to suppress, *Kyles*, 514 U.S. at 434, but he nevertheless must show a "reasonable probability" that this would have occurred. It cannot go without notice, or be dismissed as merely a slip of the rhetorical tongue, that the Master did not conclude there was a reasonable probability that Weeks' evidence "would have resulted" in the trial court suppressing Clemons' statement. Instead, the Master concluded only that Weeks' evidence "might have resulted" in that outcome. The two are very different.

> Without a doubt, [the undisclosed evidence] ***might have*** changed the outcome of the trial. That, however, is not the standard that petitioner must satisfy in order to obtain relief. He must convince us that "there is a reasonable probability" that the result of the trial ***would have*** been different if the suppressed documents had been disclosed to the defense.

*Strickler*, 527 U.S. at 289 (emphasis added).

Accordingly, the Master did not find that Clemons satisfied the first step of the materiality element, i.e., that there was a reasonable probability the trial court would have suppressed his audiotaped statement if the Weeks evidence had been disclosed.

46

### *(b) Suppression of Clemons' Audiotaped Statement Would Not Have Altered the Jury's Verdicts*

The analysis now arrives where it began: If the trial court had suppressed Clemons' audiotaped statement, has Clemons shown a reasonable probability that the jury's verdicts on guilt or punishment would have been different? This is the question that the Master thought *Kyles* did not allow him to answer. Then, the Master answered it anyway. Stating frankly that the idea of giving Clemons relief was "troubling," the Master stated: "I am dubious that the suppression of Clemons' statement would have made much difference in this case, due to the strength of the evidence …." Report at 104.

*Kyles* is not the roadblock to common sense that the Master thought (or was told) it is. There, Justice Souter traced the state's due process disclosure obligation from *Brady* to *United States v. Agurs*, 427 U.S. 97 (1976), to *Bagley*, 473 U.S. at 667. *Kyles*, 514 U.S. at 432-34. In the last of these, *Bagley*, the Court adopted the same standard for materiality for "nondisclosure" under *Brady* as it adopted for "ineffective assistance of counsel" claims under *Strickland*, i.e., that – if the state had disclosed the withheld evidence – there is a reasonable probability the jury would not have convicted the defendant or, if convicted, would have recommended a lesser punishment. *Bagley*, 473 U.S. at 682, 685.

*Kyles*, however, makes several points about this holding in *Bagley*. First, *Kyles* points out that the inmate only needs to show a "reasonable probability" of a different outcome, not that a different outcome "is more likely than not." *Kyles*, 514 U.S. at 434.

Second, Kyles explains that "a reasonable probability" can exist even though the state's case remains constitutionally sufficient to support the inmate's conviction and sentence. *Id.* And, *Kyles* explains that a series of nondisclosures by the state taken together may create a reasonable probability of a different outcome even though no single piece of undisclosed evidence – viewed in isolation – would meet this "materiality" threshold. *Id.* at 436-38.

The comment in *Kyles* that sidetracked the Master's analysis, however, is this: "[O]nce a reviewing court applying *Bagley* has found constitutional error there is no need for further harmless-error review." *Kyles*, 514 U.S. at 435. There is nothing remarkable about this statement but, presented to the Master out of context, he took it to mean that a *Brady* violation merits relief even if the undisclosed evidence would not have had any impact on the trial. That is the ***opposite*** of what *Kyles* holds.

*Kyles* explains that, under *Bagley*, a defendant must show that the state's nondisclosure was "material" (or "harmful") in order to establish a *Brady* claim. Once that is accomplished, it is logically impossible for the court to declare that same nondisclosure to be "harmless." As a result, *Kyles* notes that – even if "a harmless-error enquiry were to apply" – a "material" nondisclosure under *Bagley* cannot be a "harmless error" because the defendant has already shown "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 435.[18] *See, e.g., Jalowiec v. Bradshaw*, 657 F.3d 293, 306-07 (6th Cir.

---

[18] As context for this explanation, *Kyles* provides a synopsis of the various standards used to determine which errors are sufficiently prejudicial to merit relief. The Court first noted that, on

48

2011) (explaining that *Kyles* not only does not prohibit the court from deciding whether other evidence of guilt was overwhelming, *Kyles* requires such an analysis).

Not only does *Kyles* not prohibit examining the impact of the undisclosed evidence in light of the unaffected aspects of the evidence against the inmate, it is universally recognized that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland,* 466 U.S. at 695-96. In one of the most recent *Brady* decisions, the Supreme Court noted: "We have observed that evidence impeaching an eyewitness *may not be material if the State's other evidence is strong enough to sustain confidence in the verdict*." *Cain*, 132 S. Ct. at 630 (emphasis added) (citing *Agurs,* 427 U.S. at 112–113 and n.21).[19]

---

direct appeal: (1) ordinary trial error does not require reversal unless the error had a "substantial and injurious effect or influence in determining the jury's verdict," *Kotteakos v. United States,* 328 U.S. 750, 776 (1946); but (2) a constitutional error always requires reversal unless the error "was harmless beyond a reasonable doubt," *Chapman v. California,* 386 U.S. 18, 24 (1967). *Kyles*, 514 U.S. at 435-36. After a conviction is final, however, those rules change. Then, an inmate will not be entitled to habeas corpus relief unless he can show both a constitutional error and that the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 623 (1993) (quoting *Kotteakos, supra*). But, as *Kyles* explains, *Agurs* rejected the *Brecht* standard for *Brady* claims because "'the constitutional standard of materiality *must impose a higher burden on the defendant*.'" *Kyles* 514 U.S. at 436 (quoting *Agurs,* 427 U.S. at 112) (emphasis added). *Agurs* adopted the "reasonable probability that a different result would have occurred" formulation of materiality (that later also was adopted as the test for prejudice in *Strickland*) only after expressly noting that this standard would recognize reversible constitutional error *only when the harm to the defendant was greater than the harm sufficient for reversal under Kotteakos. Id.* (emphasis added).

[19] *See also Johnson v. Folino*, 705 F.3d 117, 129 (3d Cir. 2013) ("The materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state.")*; United States v. Bartko*, 728 F.3d 327, 340 (4th Cir. 2013) (nondisclosure not material under *Brady* where "record reveals overwhelming evidence of [defendant's] guilt"); *United States v. Qunbar*, 335 F. App'x 133, 136 (2d Cir. 2009) (nondisclosure not material for *Brady* purposes "in light of the government's substantial

Not only is this principle firmly established in Supreme Court decisions before and after *Kyles*,[20] but it is evident in *Kyles* as well. Following the brief reference to whether a "material" nondisclosure can also be "harmless," *Kyles* devotes most of its remaining pages (and all of the dissenting opinion) to a debate over whether the state's case against Kyles was too overwhelming for the undisclosed evidence to have made any difference.

> In assessing the significance of the evidence withheld, one must of course bear in mind that not every item of the State's case would have been directly undercut if the *Brady* evidence had been disclosed. It is significant, however, that **the physical evidence remaining unscathed would, by the State's own admission, hardly have amounted to overwhelming proof that Kyles was the murderer**.
>
> * * *
>
> Perhaps, confidence that the verdict would have been the same could survive the evidence impeaching even two eyewitnesses if the discoveries

alternative direct evidence" of guilt); *Coleman v. Mitchell*, 244 F.3d 533, 541-42 (6th Cir. 2001) ("even if [undisclosed evidence] had been supplied to him, the verdict would have been the same because the quantity and quality of the evidence introduced to prove Coleman's guilt was overwhelming"); *Paradis v. Arave*, 240 F.3d 1169, 1177 (9th Cir. 2001) ("It is true that if the verdict is supported by overwhelming evidence of guilt, then undisclosed exculpatory evidence that undermines only a small part of the prosecution's case may not be sufficient to undermine confidence in the outcome" under *Brady*.); *Grandison v. Corcoran*, 78 F. Supp. 2d 499, 507 (D. Md. 2000) ("considering the material claimed to have been withheld, in light of the overwhelming evidence against Grandison, the Court is of the opinion that there is utterly no chance that these materials, had they been furnished, were such that they could reasonably be taken to put the whole case in a different light so as to undermine confidence in the outcome"); *Com. v. Willis*, 46 A.3d 648, 665 (Pa. 2012) ("materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state") (quoting *Sipe*, 388 F.3d at 478).

[20] This principle is not only firmly established, it is also routinely employed. In *Strickler*, the Court found that evidence was not material under *Brady* because the "record proves **strong support** for the conclusion that petitioner would have been convicted of capital murder and sentenced to death, even if [the only eyewitness to the murder] had been severely impeached [by the undisclosed evidence]." *Strickler*, 527 U.S. at 294 (emphasis added). And, in *Cone v. Bell*, 556 U.S. 449, 474 (2009), the Court affirmed the lower court's determination that the undisclosed evidence "would not have overcome the **overwhelming evidence of Cone's guilt** in committing a brutal double murder and the persuasive testimony that Cone was not under the influence of drugs." *Id.* at 464 (quoting *Cone v. Bell*, 492 F.3d 743, 756 (6th Cir. 2007)) (emphasis added).

of gun and purse were above suspicion. Perhaps those suspicious circumstances would not defeat confidence in the verdict if the eyewitnesses had generally agreed on a description and were free of impeachment. But … [not when the] evidence would have entitled a jury to find that the eyewitnesses were not consistent in describing the killer, that two out of the four eyewitnesses testifying were unreliable, that the most damning physical evidence was subject to suspicion, that the investigation that produced it was insufficiently probing, and that the principal police witness was insufficiently informed or candid. This is not the "massive" case envisioned by the dissent[.]

*Kyles*, 514 U.S. at 451, 454 (emphasis added).

Accordingly, not only was the Master ***not prohibited*** from assessing what impact suppressing Clemons' audiotaped statement would have had in light of the state's other evidence, the Master was ***obligated*** to do so.

As set out above, Clemons first argues there is a reasonable probability Weeks' evidence would have resulted in the trial court suppressing his audiotaped statement; the Master never (quite) agreed.[21] The second step of Clemons' argument asserts, as *Kyles*

---

[21] Clemons hedges his bets by suggesting that, even if the trial court overruled his motion to suppress, "Clemons would undoubtedly have benefited from having the jury hear Weeks' unbiased account of the injuries … and the prosecutor's effort to convince him that he was mistaken about what he saw." Clemons fails to explain why this "undoubtedly" would have altered the outcome of the trial, and there is no reason to believe it is so. At trial, not knowing whether Clemons would testify or not, the trial court admitted testimony (like Weeks') that Clemons' face appeared swollen in the hours and days after he finished giving his audiotaped statement. After Clemons refused to testify at trial, the trial court ruled that, because there was no evidence from any source that Clemons was beaten by the detectives during his interrogation, defense counsel could not argue that the jury could infer Clemons had been beaten from the fact witnesses later saw his face swollen. The court said:

As I said from the beginning, counsel is permitted to argue the evidence and the reasonable inferences from the evidence. I don't think that the fact that the defendant may have suffered some injuries at some point after – or has visible signs of injury at some point after he was interrogated, and when the officers have denied that they did it, and he didn't take the stand [to say they did], I don't think that there is a reasonable inference that they did it. I think you can argue Thomas Cummins was roughed up because there is evidence."

51

explains he must, that – if his statement had been suppressed – the jury would not have convicted him of the murders of Julie and Robin Kerry or recommended the death penalty for those crimes. In his brief to this Court, Clemons argues that his statement was "the lynchpin to the State's evidence of deliberation and the only piece of testimonial evidence heard at trial placing Clemons on the platform beneath the bridge deck during the murders." The Master knew this assertion is incorrect, and – with typical thoroughness – dismantled it piece by piece:

> Clemons … says the evidence against him was weak, especially if the confession is out of the picture. In that regard, ***he says the confession was the only evidence he was under the Bridge***.
>
> * * *
>
> So far as the strength of the evidence is concerned, recall that this Court found that the evidence of Clemons' deliberation was "substantial, compelling, and without doubt." *Ibid*. at 217. At the habeas hearing, Clemons asserted his privilege against self-incrimination when asked about whether he did the following: raped the Kerry sisters; assisted in raping them; put one of them down the manhole by himself; put Tom Cummins down the manhole; went down onto the platform with Richardson, after the sisters and Cummins were on the steel platform; along with Richardson, forced the three to get on the concrete pier; and told Marlin Gray and Daniel Winfrey, "We threw them off the bridge." (H.C.T. 383-388.) ***I infer from this testimony that Clemons refused to answer those questions because the answers would have further solidified his complicity in the murders and rapes of the Kerry sisters*** on April 5, 1991.
>
> That conclusion is bolstered by the damning testimony adduced in three different murder trials. After Thomas Cummins was forced to lie facedown on the steel platform, ***he heard two sets of footsteps land, as if two people jumped down there***. He assumed that there were two people down there with the group of cousins. (Richardson T. 1599-1600) We know from Winfrey's testimony that he and Gray were off the Bridge, ***which leaves Richardson and Clemons as the two men who jumped down***

---

Tr. p. 3220. This is one of the few rulings Clemons has not challenged in the 20 years since he was convicted, and he does not challenge it now.

*onto the platform*.  The man who seemed to be *in charge was Clemons*.  (Richardson T. 1587)  One of the two apparently raped Robin Kerry on the platform as Cummins and Julie lay next to her.  (Ex. 236 at 53-54)  After they were told to get on the pier, Cummins heard a voice say, "Don't look *at us*."  (Ex. 236 at 57; Richardson T. 1641)

Were there two assailants on the platform below the deck of the Bridge?  Why would there be only one?   With Gray and Winfrey off the Bridge, *why would the guy in charge [Clemons] put one 140 pound 16 year old with an IQ of 70 [Richardson] alone with three people*, one of whom [Cummins] was a male who outweighed Richardson by 70 pounds?  *Why would Clemons or Richardson rape Robin Kerry on the platform unless someone was watching his back* while he perpetrated his crime?  And we know that *Cummins heard two people jump down onto the steel platform*.

Consider what did Clemons told Gray as he and Richardson ran off the Bridge: "*We threw them off the bridge*."  (Gray T. 1694, 1745; T. 2049, emphasis added)  Later, after the group of four went to the Chair in Alton to contemplate their evening's activities, Clemons explained to Gray that he told the victims "that he was going to kill them."  (Gray  T. 1700)  *Why did Clemons tell the young women he was going to kill them, and later announce that he and Richardson had thrown them off the Bridge, unless he had involvement in their murders*?

Report at 104-05 (emphasis added).

Clemons ignores the Master's analysis and, instead, asserts that his audiotaped statement played a key role in the jury's verdicts finding him guilty of these two murders and recommending the death penalty.  To support that assertion, Clemons points to the jury's request for his statement during its deliberations.  Not only is this a gross distortion of the record, but even a cursory look at what actually happened refutes Clemons' theory.

Shortly after the jury retired, they sent a note requesting the following:  "All photographs, tape recorded tapes (audio), statements of Winfrey, Cummins, Clemons."  Far from singling Clemons' statement out as important, the request simply included that statement in a comprehensive list of all the exhibits the jury wanted to have with them

53

during their deliberations.  What the jury *received* matters far more, however, than what they asked for.  The trial court did not allow the jury to have Clemons' audiotaped statement – or the transcript of that recording – in the jury room.  Instead, the jury was called back into the courtroom and allowed to hear Clemons' statement one additional time (following along with the transcript if they wanted to).  But they were not allowed to discuss the tape amongst themselves until they handed the transcript back to the bailiff and returned to the jury room.

Clemons is right that the evidence the jury had with them in the jury room could have been given great weight; he is only wrong about what evidence that was.  The jurors never had the tape or transcript of Clemons' statement with them, but they did have Winfrey's statement (which Winfrey made in the presence of his parents and a juvenile officer) and both of the transcripts of Cummins' taped statements to the police on the morning of April 5, 1991.  Those transcripts are 72 and 54 pages long, and they recount in torrid detail – twice – Cummins' account of what happened on the bridge only hours before.[22]  The following is an overview of what the jury would have gleaned from these transcripts:

- Gray told Cummins: "Man, this is not your lucky day.  You're in trouble.  Big trouble."  Throughout the attack, while Julie and Robin Kerry were being raped, Cummins said "people kept sayin' stuff about – uh – 'We're gonna kill you.' 'We're gonna shoot you.' Or 'You are gonna die tonight.'"  Gray told Cummins he had a gun and he would shoot Cummins if he looked anywhere but down.

---

[22]    Initially, Cummins identified the attackers as one Caucasian, and three African Americans whom he characterized as: (1) the leader and apparently oldest member; (2) the tallest member; and (3) the youngest member.  Later, Cummins identified Winfrey as the Caucasian member of the group, and he identified Clemons as (1), Gray as (2), and Richardson as (3).

54

- Cummins heard Julie and Robin screaming "Stop. Leave me alone." He heard Richardson or Clemons tell Julie, "You stupid bitch, do you want to die? I'll throw you over right now. Do you want to die?" When Julie said no, he told her to take off her pants and started counting to three. After that, Cummins could hear Julie sobbing and could not hear Robin at all.

- Clemons told Cummins, "I ain't never had the pleasure of poppin' somebody." In the course of taking Cummins' money and watch, Clemons found a badge in Cummins' wallet. He demanded Cummins tell him what the badge was for, and Cummins said he was a firefighter.

- Later, Clemons told Cummins he was a "rich fat boy" and was going to die. "He kept askin' me, 'Do you want to die? Do you want to die?' and I said, No, I don't want to die. I want to stay alive." When Winfrey told Cummins he would let him live, Clemons and Winfrey began to argue about whether Cummins should live or die. Finally, Clemons said "I fucked your girl. How does that make you feel?" He then made Cummins walk over and sit down on the edge of the manhole leading below the bridge deck to the platform and bridge pier below.

- When Cummins dropped down to the platform, he could see Julie and Robin lying there naked. He said: "And they told me to get down and lay next to them on the left…. I could feel Robin being pushed back and forth and I heard Julie say, 'Just relax, Robin. It'll all be over soon.'" When the police asked if Cummins thought one of them was having sex with Robin, he said yes. "Uh – after three or four minutes were gone – uh – they told me to get up at this time and move to my left – uh – and step down on to the concrete pier."

- When the police asked if Cummins could tell whether the assailants were on the platform below the bridge deck, Cummins said, "Yes, some – two people – I – I distinctly heard two sets of feet drop on this metal [platform]."

- After the Kerry sisters were made to join Cummins on the pier, Robin started clutching Cummins' arm. Cummins then heard one of the two say, "Stop touching each other" and "Don't touch each other or look at us."

- Moments later, someone pushed Julie and Robin off the pier and into the river below. Cummins looked, and saw it was Richardson. Cummins could hear Julie and Robin scream throughout their fall, and could hear them hit the water. Richardson then told Cummins to jump and, believing he would be killed, Cummins did.

The copy of Winfrey's statement that the jury had during deliberations, though shorter, is no less damning. More importantly, it corroborates Cummins' story almost perfectly:

- that the four were leaving the bridge when Clemons suggested going back to Julie and Robin Kerry, whom they had met on the bridge, and that Gray agreed because he said he felt "like hurting somebody;"

- that Gray handed Winfrey a condom on the walk back toward the victims, which Winfrey believed Gray had gotten from Clemons;

- that, when Winfrey said he would not rape anyone, Clemons shoved him toward the edge of the bridge and said, "You're going to do [it];"

- that Winfrey and Gray initially restrained Cummins while Clemons and Richardson attacked the other two victims;

- that Clemons shoved Robin towards Winfrey, who then laid her on the deck;

- that Winfrey saw Clemons rip Julie's clothes off and rape her while Richardson held her down;

- that Winfrey saw Clemons hold Julie down while Richardson raped her;

- that Winfrey restrained Cummins while Gray and Clemons took turns raping Robin;

- that Winfrey watched Richardson take Julie down through the manhole and onto the platform;

- that, when the rapes were finished, Winfrey watched Gray walk toward the Missouri end of the bridge;

- that Winfrey saw Clemons put Robin through the manhole down to the platform;

- that Winfrey saw Clemons, after finding a badge in Cummins' wallet, ask Cummins if he was a cop;

- that Winfrey saw Clemons drag Cummins to the manhole and put him through to the platform;

56

- that, when Winfrey told Clemons Gray had left the bridge, Clemons told Winfrey, "Hurry up, and go get him;"

- that, as Winfrey and Gray were heading back onto the bridge, they met Clemons and Richardson running off and Clemons said, "Let's go. Let's go, we threw them off."

Both Winfrey and Cummins – Clemons' accomplice and victim – testified about what happened on the bridge. If there was a "lynchpin" to the case against Clemons, it was the evidence provided by Winfrey and Cummins. Clemons' statement merely corroborates that evidence. More importantly, unlike Clemons' audiotaped statement, the jury was permitted – without objection from Clemons – to study Winfrey's written statement and Cummins' two transcripts in the jury room during deliberations. There simply is no reason to believe that Clemons' statement played as significant a role in the jury's deliberations as Winfrey's handwritten statement and the 120 pages of Cummins' statements made only hours after the events. That evidence, and the remainder of the state's case, was not "merely sufficient" to support Clemons' convictions and death sentences, it was overwhelming. Accordingly, there is no reasonable probability that – had Clemons' statement been suppressed – the jury's verdicts would have been different.

The more troubling aspect about Clemons' argument is that it continues to ignore the instructions given to the jury regarding first-degree murder and accomplice liability. There is nothing new about Clemons' claim that he should not have been convicted or sentenced to death because it was Richardson – not he – who pushed Julie and Robin Kerry to their deaths. That is what he told the detectives in his audiotaped statement, that is what he argued to the jury based on his statement, that is what Clemons argued in this

Court on appeal, and that is what he has argued in every other post conviction court for the past 20 years.

Now Clemons argues that it is reasonably probable the jury would not have convicted him and recommended he be sentenced to death if they had not heard him say that Richardson did it and that he (Clemons) played no part in their deaths. That lacks the force of logic. Given that the jury reached its verdicts despite hearing Clemons tell the detectives that it was Richardson who pushed the girls off the bridge and he (Clemons) had nothing to do with it, it is not even possible (let alone reasonably probable) that they would have reached the opposite conclusion if they had not heard Clemons' denials and explanation at all.

Clemons' defense at trial was that he cannot be guilty if he did not actually push the victims off the bridge. Now he seems to be arguing that he cannot be guilty if he did not see Richardson push them. Both theories are inconsistent with the jury instructions that make it clear it did not matter who pushed whom or who saw what, as long as the jury concluded beyond a reasonable doubt that either Clemons or Richardson intentionally and with cool deliberation killed Julie and Robin Kerry, and that Clemons coolly deliberated on that act. The jury followed those instructions and, as this Court held 17 years ago, there was *__ample evidence of statements or conduct by the defendant or in the defendant's presence indicating a purpose to kill__*." *Clemons*, 946 S.W.2d at 216 (emphasis added).

> When the plan was first conceived, Marlin Gray announced that he "felt like hurting someone." While the rapes were occurring, someone – by inference either [Clemons] or Antonio Richardson – said to Julie Kerry:

58

"*You stupid bitch, do you want to die? I'll throw you off the bridge if you don't stop fighting.*"[23]

[Clemons] threw the sisters' clothes off of the bridge. After the rapes, first Richardson and then [Clemons] each put one of the Kerry sisters through the manhole to the platform below the bridge deck, from which the sisters were pushed to their deaths. [Clemons] then returned to the bridge deck where, after robbing Cummins, *he discussed with Winfrey whether Cummins should live or die*. Gray or Richardson could not have taken part in this discussion because Richardson was under the bridge and Gray had already started to walk off the bridge. *Someone told Cummins that he had never had the pleasure of "popping" someone before*. If [Clemons] did not say this, it was said in his presence.

[Clemons] then took Cummins and moved him next to the manhole, ordering him to lie down. *Someone – either [Clemons] or Winfrey – said, "You're going to die,"* after which [Clemons] put Cummins into the manhole, before sending Winfrey to look for Gray and following Cummins through the manhole to the platform beneath the bridge himself. Once underneath the bridge, either [Clemons] or Richardson pushed the Kerry sisters from the bridge and ordered Cummins to jump into the river. *Afterward, [Clemons] bragged, "We threw them off."*

*Statements made by [Clemons] or in his presence indicated an intention to kill*. [Clemons] continued to play an active role in the death-producing events, even after it became abundantly clear that the victims would be killed. The evidence of deliberation in this case is substantial, compelling, and without doubt. The trial court did not err in submitting the charges of first degree murder to the jury.

*Id*. at 216-17 (emphasis added). All of this evidence comes from Winfrey and Cummins.

None of it comes solely from Clemons' audiotaped statement. At most, Clemons'

statement corroborates some, but by no means all, of the evidence supplied by Winfrey

and Cummins.[24]

---

[23] The Court noted in the margin: "Even if appellant did not make [this] statement, it is reasonably inferred that it was made in his presence." *Clemons*, 946 S.W.2d at 216 n.1.

[24] For example, Clemons' supposedly coerced statement does not admit that, as he and Richardson were running off the bridge, Clemons yelled to Winfrey and Gray: "We threw them off the bridge."

This Court did not need to look far to find precedent for the holding that Clemons could be guilty of first-degree murder even though he did not actually push the victims off the bridge or watch someone else do the pushing. Shortly before deciding Clemons' appeal, this Court affirmed Gray's first-degree murder convictions (and death sentences) even though the evidence was undisputed that *Gray was off the bridge completely* before the Kerrys were pushed to their deaths. *Clemons*, 946 S.W.2d at 216 (citing *State v. Gray,* 887 S.W.2d 369, 376-77 (Mo. banc 1994), for the proposition that an accomplice can be guilty of first-degree murder when statements or conduct by the defendant, or by a codefendant in the presence of defendant, prior to the murder indicated a purpose to kill someone or when the defendant continued in a criminal enterprise after it became apparent that a victim was to be killed). If Gray can be convicted and sentenced to death for these murders when he was not even on the bridge during the murders, there is no reason to lack confidence in the jury's verdicts concerning Clemons merely because he claims (wrongly) that his audiotaped statement is the only evidence that he was underneath the bridge when the Kerrys were murdered. Cummins' testimony and transcribed statements, and even inferences from Winfrey's testimony and handwritten statement, provide an ample basis for the jury to conclude that he was there. More importantly, the jury instructions and Gray's convictions demonstrate that Clemons' guilt is based on a long chain of culpable conduct – not merely that one link.

It is also worth noticing that Clemons' argument conveniently ignores the other two statements he made that the jury heard and that are entirely unaffected by Weeks' evidence. First, Clemons was sitting with others watching television at a friend's house

when a story about the Chain of Rocks Bridge murders aired. In voices loud enough to be heard by all, both Clemons and Gray remarked: "I did that." Clemons made the second statement when Officer Williams came to visit him in men's holdover on the afternoon of April 8. Williams testified:

> And [Clemons] stated to me that he had been delivering some pizza up in the Chain of Rocks area and that it was some friends of his and he had gotten drunk. And that, *that he had just got with the wrong people, and that they had raped two girls; and that the other boy had made a statement to him that one of these girls was not going to identify him; and he pushed them into the water*. And he said, "then we all left the area, and I left my flashlight."

Tr. 3141 (emphasis added).[25]

The argument that, without Clemons' audiotaped statement, the case against him was weak and – like Richardson – might not have convinced the jury that he should be sentenced to death is deeply flawed. This argument ignores the fact that Gray's jury found his culpability warranted the death penalty despite his lack of proximity to the victims at the time they were thrown to their deaths. This argument also ignores that, even ignoring his audiotaped statement, Clemons made two directly inculpatory remarks that Richardson did not: "We threw them off [the bridge]" and "I did that." Finally, this argument ignores the fact Richardson admitted his complicity and conceded his guilt to

---

[25]  There was never any contention that this statement was coerced. Instead, Clemons moved to suppress this statement on the basis that it was given without *Miranda* warnings. The trial court overruled that motion, ruling: "Detective Williams went to see the defendant sometime after he had been interrogated … which would mean he had already been given his *Miranda* rights. And, again, I'm not solid on the law on this. But it seems to me that [it is irrelevant] whether or not he – Detective Williams – whether or not he went as a friend or not, as an investigator." *Id.* at 1767. Clemons is not challenging the admissibility of this statement, and it would have been admitted even if the trial court had found that Clemons' audiotaped statement was coerced.

rape while Clemons insisted that he was not present and that Cummins was solely to blame for the girls' deaths.

The Master pointed out the irony of Clemons relying (in 2013) on not-so-new evidence to prove detectives assaulted Cummins to make him confess, when Clemons relied (in 1993) on those same detectives' testimony that they never laid a finger on Cummins. An even more bitter irony arises out of Clemons arguing (in 2013) that his audiotaped statement was the "lynchpin" of the state's case against him, when his counsel argued to the jury (in 1993) that this same statement proved he was not guilty because it proved that Richardson (not he) pushed Julie and Robin Kerry from the bridge. The instructions for accomplice liability and first-degree murder explained to the jury that the questions of Clemons' location on or under the bridge and whether he did (or did not) personally shove Julie or Robin Kerry off the bridge were not dispositive.

The Master heard the evidence presented, and personally reviewed the transcripts from the trials of Clemons, Richardson and Gray, as well as Clemons' post conviction proceedings in state and federal courts. After assimilating all that information, he concluded: "I am dubious that the suppression of Clemons' statement would have made much difference in this case, due to the strength of the evidence" against him. Report at 104. In *Brady* terminology, this means Weeks' evidence was not "material" because, even if there is a reasonable probability that it would have resulted in Clemons' statement being suppressed, there is no reasonable probability that the suppression of Clemons' statement would have resulted in any change to the jury's verdicts on guilt or

punishment. That is the question that *Cain* and numerous other cases say must be answered, and the Master's answer is plainly correct and amply supported by the record.

## IV. Conclusion

I do not know whether Clemons was beaten to compel him to give the equivocal, barely inculpatory, audiotaped statement. He claims the officers beat him; they deny his claims. Other witnesses (including Weeks) say they saw injuries to Clemons' face at various times in the hours and days after his interrogation; still others say they saw no such injuries. But all of these witnesses (***including*** Weeks) admit they have no personal knowledge of what caused Clemons' injuries (if any), and they all admit they did not observe any officer strike Clemons at any time or for any reason. Finally, there were no medical records supporting Clemons' claim, and neither the photographs taken four and a half hours after Clemons' interrogation nor those taken 36 hours later show signs of any such injuries.

But it is not this Court's job to decide whether Clemons was beaten. The trial judge – and only that judge – was responsible for weighing the conflicting direct evidence (i.e., testimony from Clemons and the officers) and the conflicting circumstantial evidence (i.e., the photos and testimony of all those who saw Clemons at various times after his interrogation) to determine whether Clemons' statement was voluntary. That process resulted in a finding that Clemons' motion to suppress must be denied because the state proved it was more likely than not that Clemons' statement was voluntary.

Would the trial judge have reached this same conclusion if he had heard Weeks' testimony? The Master said Weeks' story "may have" changed the outcome of the suppression hearing. I do not agree. Because the trial court believed the officers and did not believe Clemons, there is no likelihood that the trial court would have been swayed by another in a long line of contradictory witness who saw (or did not see) injuries on Clemons' face hours and days later but had no direct knowledge about how such injuries (if any) were caused.[26]

Even if Weeks' testimony would have caused the trial judge to suppress Clemons' audiotaped statement, Clemons should not be given relief because there is no reasonable probability that – without Clemons' statement – the jury would not have convicted him or sentenced him to death. The Master was "dubious" that the exclusion of Clemons' statement would have made any such difference due to the weight of the other evidence against Clemons. I agree.

Clemons' audiotaped statement aside, the evidence supporting Clemons' convictions and sentences is overwhelming. The Supreme Court has declared repeatedly that a *Brady* claim cannot succeed under such circumstances. *See Cain*, 132 S. Ct. at 630 ("Evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict."); *Cone*, 556 U.S. at 474 (given the

_____

[26] As noted above, the Court should not even be reviewing this claim because it was not raised in Clemons' 2009 Petition or any amended or supplementary pleading, it was not one of the issues this Court appointed the Master to hear, and it "arose" so late in the Master's proceedings that it was never mentioned at the Master's evidentiary hearing or in the parties' initial arguments and would not have been mentioned in the Master's report but for his having left the record "open" to allow for Clemons' last-minute deposition of Weeks.

State's overwhelming evidence, any "likelihood that the suppressed [*Brady*] evidence would have affected the jury's verdict on the issue of insanity is therefore remote"); *Strickler*, 527 U.S. at 294 (*Brady* evidence impeaching eyewitness was not material in light of overwhelming evidence of guilt); *Kyles*, 514 U.S. at 451 (state concedes remaining evidence of guilt would "hardly have amounted to overwhelming proof that Kyles was the murderer"). Here, the evidence showed that Clemons was the leader of the group that fell upon Julie and Robin Kerry and Thomas Cummins on the Chain of Rocks Bridge more than a generation ago. Clemons threatened to kill them and/or stood by his accomplices as they made the same threats. Clemons shoved Cummins and the two girls down onto the deck below the roadbed of the bridge and/or watched as others did so. Finally, even if Clemons did not push these two young women to their deaths, Clemons' statement to Officer Williams admits that he knew his accomplice was going to do so and admits, further, that Clemons watched (and/or listened) while that occurred.

It is far too late for Clemons to be splitting such irrelevant hairs as where he was standing when the murders occurred. The Master expressly found that there was compelling evidence putting Clemons on that platform with the victims shortly before their deaths. In any event, Clemons' supposedly involuntary statement is equivocal on this point because Clemons maintains throughout the statement that he did not play any role in the victims' deaths. Far more compelling are Clemons' statements: (a) to Officer Williams (Clemons fell in with the wrong group, raped two girls, heard an accomplice say he would not allow the victims to identify them, and threw them off the bridge); (b) to his accomplices Gray and Winfrey as he ran from the bridge ("We threw them off");

65

and (c) to his friends while watching a later news account of the crime ("I did that"). Two transitory hearings of Clemons' audiotaped statement cannot have made anywhere near the impact on the jury that these statements made, and these statements pale in comparison to the transcribed statements Cummins and Winfrey made that were sent to the jury room at the jury's request (without objection from Clemons) and that recount at great length the factual details supporting Clemons' guilt and culpability.

Like the Master, therefore, I am troubled by the fact that Clemons has now succeeded in having his convictions and sentences wiped away despite the fact that there is no likelihood that the jury would have reached a different verdict if they had not heard Clemons' audiotaped statement; a self-serving statement that, in context, played no significant role in the state's case and was relied upon more at trial by Clemons than by the state. Accordingly, I respectfully dissent and would deny Clemons' petition on its merits.

_____
Paul C. Wilson, Judge